**EQUAL EMPLOYMENT OPPORTUNI-
TY COMMISSION, Plaintiff,**

**v.**

**EAZOR EXPRESS COMPANY,
INC., Defendant.**

Civ. A. No. 78–585.

United States District Court,
W. D. Pennsylvania,
Third Division.

Oct. 24, 1980.

Robert L. Williams, Larry Besnoff, Spencer H. Lewis, Philadelphia Regional Office of General Counsel, Philadelphia, Pa., for plaintiff.

James Prozzi, Martin Lubow, Pittsburgh, Pa., for defendant.

## PRELIMINARY STATEMENT, FINDINGS OF FACT, CONCLUSIONS OF LAW, DISCUSSION AND ORDER

SIMMONS, District Judge.

### Preliminary Statement

The Plaintiff in this action is the United States Equal Employment Opportunity Commission, hereinafter referred to as the Commission or EEOC. The Commission is an agency of the United States of America charged with the administration, interpretation and enforcement of Title VII of the

Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000e, *et seq.* (1976 ed.), hereinafter referred to as Title VII.

Defendant, Eazor Express Company, Inc., hereinafter referred to as Eazor, is a Pennsylvania corporation doing business in the Commonwealth of Pennsylvania. It is a trucking company engaged in the business of interstate transportation of goods. Eazor operates terminals at various locations throughout the United States, including West Middlesex, Pennsylvania.

Title VII prohibits employers from discriminating against any individual with respect to employment opportunities because of that individual's race, color, religion, sex or national origin.

Jurisdiction of this Court is invoked pursuant to 28 U.S.C. Sections 451, 1343(4) and 1345. The Commission is expressly authorized to bring this action by Section 700(f)(1) and (3) of Title VII.

The Commission alleges in its Complaint that Eazor violated Title VII when it engaged in the unlawful discriminatory employment practice of failing to recall Dixie Lee Jackson from layoff status because of her sex.

The Commission seeks a permanent injunction enjoining Eazor from engaging in any employment practice which discriminates on the basis of sex. Additionally, the Commission seeks an Order requiring Eazor to institute and implement policies, practices and affirmative action programs which provide equal employment opportunities for women. Finally, the Commission seeks an Order that Defendant reinstate Jackson, pay her back wages, including interest, and any other relief to which Plaintiff is entitled.

## Findings of Fact

1. Plaintiff, Equal Employment Opportunity Commission (EEOC), is a federal agency created by the United States Government to administer, interpret and enforce Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (1976 ed.).

2. Defendant, Eazor Express Company, Inc., (Eazor), is a Pennsylvania corporation which operates a trucking company engaged in the interstate transportation of goods. Eazor operates terminals at various locations throughout the United States, including West Middlesex, Pennsylvania. D. Response to Admissions, No. 1.

3. Since at least July 2, 1965, Defendant has continuously and is now an employer in an industry affecting commerce within the meaning of Section 701(b), (g) and (h) of Title VII.

4. Since at least July 2, 1965, Defendant has continuously and does now employ fifteen (15) or more employees for each working day in each of twenty or more calendar weeks within the meaning of Section 701(b), (g) and (h) of Title VII.

5. More than thirty (30) days prior to the institution of this lawsuit, Dixie Lee Jackson filed a charge with the Plaintiff, EEOC, alleging a violation of Title VII by Defendant. P.Ex.No. 1.

6. On or about July 19, 1976, Jackson filed a charge of discrimination, No. 034–76–1712–0, with the EEOC alleging that Defendant discriminated against her because of her sex, female, by refusing to recall her from layoff even though openings existed and a male employee with less seniority than she was recalled to fill one of the openings. Tr. 174; D. Response to Admissions, No. 3; P.Ex., No. 1.

7. Concurrent with Jackson's filing of Charge No. 034–76–1712–0, she requested that the Pennsylvania Human Relations Commission waive its exclusive jurisdiction and allow EEOC to proceed immediately with the investigation of her complaint. D. Response to Admissions, No. 4; P. Ex., No. 2.

8. Jackson's charge was deferred to the Pennsylvania Human Relations Commission on or about July 26, 1976, and it formally waived its jurisdiction of Jackson's charge as she had previously requested on or about the same date. D. Response to Admissions, Nos. 5 and 6; P.Ex., No. 4.

9. Plaintiff issued Form 131, Notice of Charge of Employment Discrimination, to Defendant on or about July 26, 1976, and an

employee of Defendant Corporation signed for receipt of this notice on or about July 27, 1976. D. Response to Admissions, Nos. 7 and 8; P.Ex., Nos. 5 and 6.

10. Plaintiff conducted an investigation of Jackson's charge No. 034–76–1712–0, which involved interviews with Bernard Halgas, Defendant's West Middlesex Terminal Manager and Anthony Simoes, Defendant's Director of Labor Relations, as well as other employees for Defendant at the West Middlesex Terminal who were familiar with the office operations of Defendant on or about February 4, 1977. Defendant was given an opportunity to submit all information it felt pertinent in support of its position. D. Response to Admissions, Nos. 9 and 10.

11. On or about March 14, 1977, the Director of the Pittsburgh District Office of the EEOC issued a Letter of Determination on Jackson's charge finding reasonable cause to believe that the Defendant's failure to recall Jackson from Layoff status was due to her sex, female, in violation of Title VII of the 1964 Civil Rights Act, as amended. D. Response to Admissions, No. 11; P.Ex., No. 7.

12. On or about March 14, 1977, a copy of the Letter of Determination was mailed to Simoes; receipt of that letter was signed and returned to Plaintiff on or about March 15, 1977, by an employee of Defendant. D. Response to Admissions, Nos. 12 and 13; P.Ex., No. 8.

13. Attached to the Letter of Determination received by Defendant on or about March 15, 1977, was Form 153, entitled "Invitation to Participate in Settlement Discussions". D. Response to Admissions, No. 14; P.Ex., No. 9.

14. On or about March 17, 1977, Defendant's attorney, Martin Lubow, Esq., communicated with Plaintiff by letter informing it that Defendant had received the Letter of Determination and that the Defendant did not wish to discuss settling this matter. D. Response to Admissions, No. 15; P.Ex., No. 10.

15. On or about March 23, 1977, Plaintiff sent a letter to Martin Lubow, Esquire, informing him Plaintiff considered that its efforts to conciliate Jackson's charge, No. 034–76–1712–0, had failed and that if he wanted to continue these efforts he must give written notice within five (5) days of receipt of Plaintiff's letter. D. Response to Admissions, No. 16; P.Ex., No. 11.

16. Defendant's attorney received Plaintiff's March 23, 1977 letter on or about March 28, 1977, and a receipt of service was signed by an employee of his law office. D. Response to Admissions, No. 17; P.Ex., No. 12.

17. Defendant failed to communicate with Plaintiff in response to its March 23rd letter. D. Response to Admissions, No. 18.

18. Eazor operated a trucking terminal in Sharon, Pennsylvania on or about May 23, 1969. In 1971, the terminal was moved to West Middlesex, Pennsylvania. Some of the basic duties from that time to the present at these locations are:

a. Accounts Receivable Clerk–The accounts receivable clerk handles all funds turned in by drivers. The clerk goes to the bank each morning for monies turned in overnight. The clerk prepares necessary paperwork for making bank deposits, bank clearings and interline payments. The clerk makes bank deposits and does office filing. When checks come in the mail, the clerk pulls the invoice from the file and compares the check with the amount due. A transmittal form is prepared and all bills and checks for the day are sent to Defendant's Pittsburgh office. Tr. 55–61, 313–314. Accounting experience and some typing skills are needed to be an accounts receivable clerk. Accuracy is very important since large amounts of money are handled. The accounts receivable clerk must complete the work received that day to get it in the mail. Tr. 413. If a problem arises, it is taken care of early. Tr. 415–416.

b. Tracing Clerk–The tracing clerk handles requests from shipping customers to locate lost, missing or delayed freight. Tr. 87. The clerk looks for lost freight by checking files at the Sharon terminal and by telephoning other freight terminals. No special skills or educational background are needed to be a tracing clerk. All employees did some tracing work. Tr. 349.

c. O S & D Clerk—The odd, short and damaged clerk handles claims by shipping customers when the freight delivered is less than was shipped, more than was shipped, or damaged during shipment. Tr. 89. No special skills or educational background are needed to be an O S & D Clerk. Tr. 278–9, 496.

d. Rating Clerk—The rate clerk determines the current shipping cost for each shipment based on established tariffs. The clerk places the proper rate on the shipping order form which the shipping customer gives to the truck driver. Tr. 91. This is a position which requires special rate training and experience.

e. Billing Clerk—The billing clerk uses costs information placed on the customer's shipping order to type out the shipping bill. Tr. 462. The clerk copies information which includes the shipper's name, the consignee's name, the nature of the freight and the weight of the shipment. Tr. 89, 90, 316, 321. Typing skills are needed to be a billing clerk. Tr. 225, 226, 261.2, 326, 497. Most of the work is typing. Tr. 225, 326. The primary function is to transpose information from the bill of lading to the freight bill. Tr. 320, 321, 325. Anyone can do billing clerk work without any prior trucking experience if they can type well. Tr. 598.

Anyone in the office, including Jackson, could do the billing clerk and manifesting clerk work because it's simple copying and typing. Tr. 414. As Halgas stated at trial:

Q. Who would perform the billing and manifesting during the day time if it had to be done?

A. Well, provided the rate man rated the bills, anyone.

Q. Anyone in the office?

A. Yes, could type the bill.

Q. Mary Beardsley from 1971 to 1973—

The Court: Let him explain his answers.

The Witness: Anyone from dispatchers to terminal manager back to Mary might be working at that time and could do that because it's simple copying and typing, and that's all.

f. Manifest Clerk—The manifest clerk prepares a manifest form for each truckload of freight leaving the terminal. The clerk takes the shipping bill information for each shipment placed on a truck and lists all goods on the truck, along with the total weight and number of shipments. The manifest is a listing of all freight on a particular truck. The clerk also issues toll tickets and special handling instructions. Tr. 134–137. Typing skills were needed to be a manifest clerk. Tr. 227. The policy of typing manifests changed company—wide at Eazor. The manifests are now prepared in pencil. Tr. 495. Accuracy is a skill required to be a manifest clerk. Tr. 494.

19. A person with good typing skills could qualify to be a billing clerk, a manifest clerk or an O S & D clerk after thirty (30) days or less of on–the–job training. Tr. 226, 227, 229, 326, 328, 352, 497. Billing clerk is one of the simplest jobs in the office. Tr. 512.

20. A person with two (2) years experience in Defendant's Sharon or West Middlesex office would automatically qualify to be a billing clerk, manifest clerk or O S & D clerk with little or no training.

21. No special skills (except typing) or educational background are needed for a person to qualify as a billing clerk, manifest clerk or O S & D clerk. Tr. 226–7.

22. The billing clerk and manifesting clerk duties are often done by the same employee.

23. The accounts receivable clerk, tracing clerk and O S & D clerk duties are often done by the same employee.

24. Eazor's Sharon or West Middlesex terminal was a small operation and the office personnel were not locked into the specific job descriptions listed above. All of the office employees handled telephone calls and assisted each other whenever it was required by the workload. Tr. 307. Except for the rate clerk's position, all of the employees had done the other employee's job duties from time to time.

25. The daytime office employees worked as general clerks with knowledge of the duties of each job. Tr. 306, 307.

26. Eazor's workforce from 1968 to 1977 at the Sharon/West Middlesex terminal has consistently underutilized females. Of the seven job categories at the terminal, Eazor only hired females as clericals. No females were ever employed as officials and managers, sales workers, craftsmen (skilled), operatives, laborers (unskilled) or service workers. In the one category where females were employed, they were underutilized in comparison to the 1970 Census data for Mercer County in nine of the ten years. At West Middlesex terminal since 1971, no females were ever hired as raters, billers, manifesters, managers or dispatchers. Tr. 252–3, 487–9.

27. Dixie Lee Jackson (Jackson), a female, was employed by Eazor as an accounts receivable Clerk, from May 23, 1967 to July 27, 1971, at its Sharon, Pennsylvania terminal. Tr. 53, 54; D. Response to Admissions, No. 20.

28. The work Jackson performed in 1969, included billing customers, interline work (when a shipment was carried by another trucking company before or after transfer by Eazor), receiving monies from drivers, handling checks sent by mail, deposit monies, typing, sending reports to the Pittsburgh office, filing, special billing, bank clearings (when a shipper's bank pays the bill directly), and answering the telephones. Tr. 55–61, 67. She also performed billing clerk work. Tr. 510–12; P.Ex., No. 13.

29. Jackson capably completed all of the duties of the accounts receivable clerk. Tr. 56.

30. On July 26, 1971, Jackson worked two jobs, her accounts receivable job and the statistical secretary job. Tr. 69, 147. Jackson only had two days training as statistical secretary. The job required at least thirty days training. Tr. 394. Jackson was not properly trained or given assistance to complete the two jobs. Tr. 144, 146. Jackson worked 14 hours from 8:00 a. m. to 11:00 p. m. and was unable to complete the assigned work. Tr. 74, 159. Jackson quit her job. There was insufficient time for Jackson to complete both jobs. Tr. 395.

31. Jackson was reemployed by Eazor as an accounts receivable clerk from January 24, 1972, to November 23, 1974, at which time she was laid off. Her seniority date is also January 24, 1972. P.Ex., No. 13, pg. 6. The work she performed included accounts receivable, doing interline work, receiving all monies, banking deposits, cashier, tracing, O S & D, filling, billing clerk work, and manifesting. Tr. 85, 89, 100–101; P.Ex., No. 13.

32. In 1972, Krantz was the terminal manager. When he was out of the office, Robert Rowles would be in charge. Bernard Halgas, the Operations Manager, was responsible for the dockmen and not the office employees. Halgas did not have knowledge of Jackson's work. Tr. 94–98.

33. On or about November 23, 1974, John Louden, a salesman with more seniority than Jackson, was laid off. In accordance with Defendant's policy of using seniority for lay–off purposes, Louden bumped into Jackson's position. Tr. 107. Jackson did not contest the layoff because she was pregnant and under doctor's orders to cease working. Tr. 210.

34. Jackson was recalled by Eazor from May 12, 1975, to November 21, 1975, primarily as an accounts receivable clerk, at which time she was involuntarily laid off. The work she performed during this time period included accounts receivable, doing interline work, receiving all monies, banking deposits, tracing, O S & D, filing, billing clerk and manifesting work. There is no question about Jackson's ability to do the billing clerk and manifesting work. Eazor admitted that she had the skills in 1977. See P.Ex., No. 13, pg. 4, questionnaire filled out by Eazor. Copies of actual bills that Jackson prepared were submitted into evidence. See P.Ex., Nos. 41–1 to 41–13. Jackson could type. Tr. 374–5. Jackson testified at trial that she did billing clerk work, manifesting clerk and O S & D clerk work. Tr. 101, 107, 89.

35. Although Jackson personally visited Eazor's terminal at least four times in the ensuing months to ask about being recalled, Eazor has refused to recall her to any posi-

tion. Tr. 112, 113, 342, 427, 428; P.Ex., No. 1, pg. 3. Jackson has asked for reinstatement to any job during any workshift, part–time or full–time. Tr. 114, 115.

36. Jackson was ready, willing and able to fill any job at the terminal.

37. Jackson had experience doing typing, billing manifesting, and O S & D work while at the Sharon and West Middlesex terminals. Tr. 137, 139; Tr. 230, 311, 430; P.Ex., No. 13, pg. 4.

38. Jackson, as Accounts Receivable Clerk, had to process the bills which had been prepared the night before by the billing clerk. The billing clerk must finish the bills that night. The Accounts Receivable clerk has the same pressure to finish the same bills the next day. The pressure is identical.

39. Jackson could handle the daily pressure of getting her job done everyday. Tr. 418. She handled the same number of bills as the billing clerk and had the same time requirements.

40. Jackson's quitting on July 26, 1971, does not show that Jackson could not handle pressure. It shows that Eazor failed to properly train Jackson for the statistical secretary position. It shows that Eazor assigned two jobs to Jackson to be completed in eight hours when eight hours were insufficient. Eazor failed to show any instance where Jackson failed to handle pressure. Tr. 408.

41. Jackson was an industrious worker who satisfactorily completed her duties. Eazor's records show that it would have rehired Jackson after the lay–off on November 23, 1974, and November 21, 1975. P.Ex., Nos. 35 and 37. Eazor did rehire her after each lay–off because she was well qualified to work in Defendant's office.

42. Jackson was never disciplined by Eazor and never had a disciplinary record. P.Ex., No. 13, pg. 4. Jackson was never informed by Eazor that she was not performing or had not performed her assigned duties, including billing clerk and manifesting work, in a satisfactory manner. Tr. 101, 114, 137–138, 418–19, 430.

43. Jackson could do the billing clerk duties just as competently as Rodgers, even though Gerald Rodgers (Rodgers) had been doing billing full time. Tr. 184–5. Jackson was a competent clerk. Tr. 262.

44. Billing Clerk work is merely copying information from one form to the next. Once the knowledge of the duties is obtained no additional practice is needed. The fact that Rodgers did the billing clerk job for a longer period of time did not make him any better at the duties.

45. Jackson received a diploma after attending the New Castle Business College from March, 1967 to March, 1969. Tr. 51–52. Her courses included accounting, auditing, federal taxes, psychology, credit and collections, economics, money and banking, math, intermediate accounting, cost accounting and business law. Tr. 52.

46. Rodgers, a male, was hired by Eazor as a clerk on or about February 27, 1974. His seniority date is also February 27, 1974. Tr. 454. Jackson's seniority date was May 23, 1969. Tr. 53, 54.

47. Rodgers was laid off on or about January 20, 1975. Tr. 464.

48. Rodgers was called by Eazor on at least five occasions to work part–time as a general clerk while he was on lay–off. Tr. 466; P. Ex., No. 13. Jackson was never offered any part–time employment while she was on lay–off, even though she had more seniority.

49. Rogers was recalled by Robert Rowles at the West Middlesex terminal as a part–time billing clerk and manifesting clerk on or about June 28, 1976. Tr. 466. Rodgers worked 4–5 hours a day. Tr. 467; D. Response to Admissions, No. 31. Rodgers worked 4–5 hours a night for a couple of months. Tr. 467.

50. Rodgers was converted to a full–time status on December 27, 1976. He continued to be the billing clerk and manifesting clerk and also assisted the O S & D clerk. Tr. 467.

51. Rodgers has been employed full–time from December 27, 1976, to the present time. Tr. 468, 475.

52. Eazor had a policy or practice of training and promoting males. Robert Rowles began as a rating clerk and was promoted to night dispatcher. He is now operations manager at West Middlesex. Tr. 483. Bernard Halgas was hired as a management trainee, became Operations Manager and then Terminal Manager. Tr. 271–2. Ed Slater was an O S & D clerk, became a dispatcher and is now a terminal manager. Gerald Rodgers was a billing clerk and is now a dispatcher. Tr. 420–421. Eazor never hired or promoted a female to any of the above positions at West Middlesex. Tr. 422–3.

53. Rodgers was continually given on-the-job training by Eazor personnel. Tr. 455, 456, 458, 474, 475. Rodgers progressed, because of the training, from billing and manifesting clerk to dispatcher. Tr. 475. Jackson was never trained by Eazor personnel to do work which would have qualified her for a promotion. The billing, manifesting and O S & D positions were filled by people who had been given on-the-job training. Tr. 489.

54. There were no written policies or standards controlling lay–off or recall from lay–off at the West Middlesex terminal.

55. On or before June 28, 1976, Eazor had an unwritten policy and practice at its West Middlesex terminal of recalling employees from lay–off status on the basis of seniority. Eazor also considered the ability of the person on layoff to do the job available.

56. There is no question about Eazor's policy. Defendant's counsel made it clear during his opening statement that the "policy" in West Middlesex was to use the length of service. Tr. 9. Thomas C. Eazor, Vice President and General Manager of Defendant in 1976, stated that length of service and qualifications for the job were the factors considered when recalling employees from lay–off. Tr. 41, 47, 48. Bernard Halgas also stated that seniority would be used to determine recall "if the person was qualified for a job opening." Tr. 428. Robert C. Eazor, President of Defendant in 1976, said that qualifications and length of service were used with respect to recall.

Tr. 558–60. On August 19, 1976, Defendant sent the EEOC a written response to an interrogatory which stated that lay–off is by seniority and qualifications. P.Ex., No. 13, pg. 4. Anthony Simoes, who was Director of Labor Relations for Defendant in 1976, stated at his disposition that seniority should be honored in lay–off situations except when an employee could not perform the job. P.Ex., No. 25, pgs. 8 and 9.

57. Implementation of the lay–off and recall policy was subjective and discretionary by the terminal manager. Tr. 28–29; P.Ex., No. 25, pg. 5.

58. On June 28, 1976, Eazor had a position open for a part–time general clerk to do billing, manifesting work and other general office work. Tr. 357–8, 360, 446.

59. On June 28, 1976, Halgas and Eazor knew that:

a. Eazor had an unwritten policy or practice of recalling employees from lay–off on the basis of seniority. Tr. 9, 41, 47, 48, 428, 558–60; P.Ex., No. 13, pg. 4; P.Ex., No. 25, pgs. 8 and 9;

b. Rodgers had less seniority than Jackson. Tr. 200; P.Ex., No. 13, pgs. 5 and 6;

c. Jackson had attended business college for two years and received a degree. Tr. 52;

d. Jackson was available for full or part–time work during the day or night. Tr. 114, 115;

e. Jackson was qualified to do billing, manifesting, and O S & D, in addition to her other duties of accounts receivable. Tr. 368; P.Ex., No. 13; and

f. Jackson would have accepted the position if offered. Tr. 115.

60. On June 28, 1976, when Halgas hired Rodgers part–time and on December 27, 1976, when he hired Rodgers full–time, he did not:

a. Consider Jackson's ability to perform the available work;

b. Consider Jackson's greater seniority;

c. Inform Jackson that the position was available. Tr. 356; or

d. Consider Jackson's past work history or her voluntary termination on July 27, 1971. Tr. 391, 392, 393, 401.

61. Halgas recalled Rodgers on June 28, 1976, because he decided "that Mr. Rodgers was the *man* for the job." Tr. 333, lines 15–16 (emphasis added).

62. Defendant's contention that Rodgers had any skills which made him superior to Jackson depends solely on innuendo, supposition and double–talk. Tr. 583–584. Defendant's whole position comes down to a question of ability to handle pressure. Tr. 584–5.

63. While Jackson was on lay–off, after June of 1976, Halgas never contacted Jackson about any openings or part–time work. Halgas hired trainee supervisors, who were males, and part–time billers, who were males, with no experience. He also recalled John Louden on a part–time basis to do accounts receivable work. Tr. 603–07.

64. Halgas' failure to consider or recall Jackson on June 28, 1976, for the available clerk position was based upon Jackson's sex.

65. Eazor's failure to recall Jackson on June 28, 1976, and December 27, 1976, violated Eazor's own policy or practice of using seniority to determine the order of recall from lay–off.

66. Eazor's failure to recall Jackson on June 28, 1976, and on December 27, 1976, was based on Jackson's sex.

67. In computing backpay, a comparative analysis was made of the salary information submitted by Defendant on Rodgers and information submitted by Jackson relative to her earnings and other income from June 28, 1976, up to the date of entry of the Court's Order. P.Ex., No. 52 has been revised to show income for Rodgers from April 1, 1976, to December 27, 1976, based on four hours work a day. A copy follows. P.Ex., No. 51; Tr. 128–135, 437, 467–8.

EEOC v. Eazor Express Co., Inc.
Civil Action No. 78–595

Quarterly Back Pay Computations
From: June 28, 1976 to December 31, 1979

Revised Plaintiff's Ex. No. 52
Figures for 1976 for Rodgers
based on 4 hours per day.

| Year | Quarterly Dates | JACKSON Quarterly Earnings | Unemployment Compensation | Total | RODGERS Quarterly Earnings | Differential | 6% Interest Compounded Quarterly | Back Pay with Interest | Total Back Pay |
|---|---|---|---|---|---|---|---|---|---|
| 1976 | April 1 to June 30 | | 42.60 | 42.60 | 45.00 | 2.40 | .60 | 3.00 | 3.00 |
| | July 1 to September 30 | 944.88 | 582.20 | 1,527.08 | 990.00 | –0– | –0– | –0– | 3.00 |
| | October 1 to December 31 | | 932.60 | 932.60 | 990.00 | 57.40 | 10.22 | 67.62 | 70.62 |
| 1977 | January 1 to March 31 | | 934.40 | 934.40 | 1,920.00 | 985.60 | 192.19 | 1,177.79 | 1,248.41 |
| | April 1 to June 30 | | 890.60 | 890.60 | 1,982.00 | 1,091.40 | 193.51 | 1,285.01 | 2,533.42 |
| | July 1 to September 30 | 1,586.64 | | 1,586.64 | 2,244.00 | 657.36 | 105.18 | 762.54 | 3,295.96 |
| | October 1 to December 31 | 1,562.60 | | 1,562.60 | 2,210.00 | 647.40 | 92.51 | 39.91 | 4,035.87 |
| 1978 | January to March 31 | 1,633.32 | | 1,633.32 | 2,210.00 | 576.68 | 72.72 | 649.40 | 4,685.27 |
| | April 1 to June 30 | 1,633.32 | | 1,633.32 | 2,358.00 | 724.68 | 79.35 | 804.03 | 5,489.30 |
| | July 1 to September 30 | 1,633.32 | | 1,633.32 | 2,470.00 | 836.68 | 77.98 | 914.66 | 6,403.96 |
| | October 1 to December 31 | 1,633.32 | | 1,633.32 | 2,470.00 | 836.68 | 64.51 | 901.19 | 7,305.15 |

| Year | Quarterly Dates | JACKSON Quarterly Earnings | Unemployment Compensation | Total | RODGERS Quarterly Earnings | Differential | 6% Interest Compounded Quarterly | Back Pay with Interest | Total Back Pay |
|---|---|---|---|---|---|---|---|---|---|
| 1979 | January 1 to March 31 | 1,750.02 | | 1,750.02 | 2,470.00 | 719.98 | 44.06 | 764.04 | 8,069.19 |
| | April 1 to June 30 | 1,772.29 | | 1,772.29 | 2,470.00 | 697.71 | 31.82 | 729.53 | 8,798.72 |
| | July 1 to September 30 | 1,904.00 | | 1,904.00 | 2,509.60 | 605.60 | 18.29 | 623.89 | 9,422.61 |
| | October 1 to December 31 | 2,016.00 | | 2,016.00 | 2,783.40 | 767.40 | 11.51 | 778.91 | 10,201.52 |

PROJECTED BACK PAY COMPUTATION

FROM January 1, 1980 to March 31, 1980

| Quarter | Dixie L. Jackson | Gerald Rodgers | Difference |
|---|---|---|---|
| 1980 January 1 to March 31 | $1,940.00 | $2,979.20 | $1,039.20 |

68. Computed on a quarterly basis, Rodgers earned $30,122.00, in 15 quarters covering June 28, 1976, to December 31, 1979, during which time he was continuously employed by Defendant.

69. Computed on a quarterly basis, Jackson had income of $21,452.11, which included earnings from employment and workmen's compensation for 15 quarters covering June 28, 1976, to December 31, 1979. Tr. 123–125; P.Ex., Nos. 43 to 50.

70. Rodgers earned $9,206.97, more than Jackson for 15 quarters from June 28, 1976, to December 31, 1979.

71. The total backpay plus interest compounded quarterly at six (6%) per cent, for 15 quarters from June 28, 1976, to December 31, 1979, is $10,201.52.

72. Backpay for Jackson from January 1, 1980, up to date of entry of the Court's Order should be computed in the same manner as the backpay was computed for the earlier period.

73. Rodgers has continued in the employment of Defendant from June 28, 1976, to the present. Tr. 475.

74. Backpay for the first three quarters of 1980, is $1,039.20, per quarter. Backpay from January 1, 1980, to September 30, 1980, is $3,117.60. Total backpay, plus interest is $13,319.12.

CONCLUSIONS OF LAW

1. This Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 451, 1343 and 1345. D. Proposed Conclusions of Law, No. 1.

2. This is an action authorized and instituted pursuant to § 706(f)(1) and (3) and (g) of Title VII of the Civil Rights Act of 1964,

as amended, 42 U.S.C. § 2000e, *et seq.* (1976 ed.), hereinafter referred to as Title VII.

3. Since at least July 2, 1965, Defendant has continuously been and is now a Pennsylvania Corporation doing business within the Commonwealth of Pennsylvania and the Western Judicial District of Pennsylvania as a common motor carrier.

■ 4. Since at least July 2, 1965, the Defendant has continuously been and is now an employer engaged in an industry affecting commerce within the meaning of § 701(b), (g) and (h) of Title VII. D. Proposed Conclusions of Law, No. 2.

5. Since at least July 2, 1965, Defendant has continuously and does now employ fifteen (15) or more employees for each working day of twenty or more calendar weeks within the meaning of § 701(b) of Title VII, 42 U.S.C. § 2000e(b). D. Proposed Findings of Fact, No. 3.

6. Plaintiff has complied with all conditions precedent to the institution of this lawsuit. P.Ex., Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 55. D. Response to Admissions, No. 19.

■ 7. Plaintiff in a Title VII trial has the burden of establishing a prima facie case of discrimination. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (1977); *Albemarle Paper Company v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975); *McDonnell–Douglas Corporation v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

■ 8. Plaintiff need not demonstrate discriminatory intent of Defendant, but need only show an act or practice discriminatory in effect. *McDonnell–Douglas Corporation v. Green, supra.*

■ 9. Plaintiff has established a prima facie case by showing that:

a) Dixie Lee Jackson (Jackson) was a female employee to Eazor entitled to Title VII protection;

b) Jackson had satisfactorily performed her duties while employed by Eazor;

c) Jackson's lay–off on November 21, 1975, was pursuant to Defendant's practice/policy of using seniority and ability to determine who would be recalled from a lay–off;

d) The job of billing and manifesting clerk, which included billing, manifesting and O S & D, became available sometime before June 28, 1976;

e) Jackson was qualified to perform all of those duties; Defendant had knowledge of Jackson's qualifications for this position, however, Defendant chose to recall a male with less seniority on July 28, 1976;

f) Jackson asked to be recalled to any available job;

g) The sole reason Jackson was not recalled was because of her sex. *International Brotherhood of Teamsters v. United States,* supra; *Albemarle Paper Company v. Moody,* supra; *McDonnell–Douglas v. Green,* supra.

■ 10. Plaintiff having established a prima facie case, the Defendant may come forth and *articulate a valid non–discriminatory reason.* If Defendant meets that obligation, then Plaintiff must show that the reason articulated by Defendant is pretextual. *Furnco Construction Corporation v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); *McDonnell–Douglas v. Green,* supra.

■ 11. Plaintiff has met the burden of establishing that the Defendant's reasons for not recalling Jackson were pretextual by showing:

a) That Jackson was a satisfactory employee while working for Eazor from 1972 to 1975;

b) That Jackson had performed the duties of the billing clerk, manifesting clerk and O S & D clerk, as well as accounts receivable clerk;

c) That Jackson visited with the terminal manager on several occasions seeking reemployment prior to June 1976. P.Ex., No. 1, pg. 3;

d) There was work available for Jackson in June 1976;

e) Jackson was qualified to do billing, manifesting, and O S & D clerk work;

f) Rodger's additional experience as a billing clerk did not make him more qualified than Jackson;

g) Jackson could handle pressure;

h) Defendant had a vacancy for billing and manifesting clerk;

i) That Jackson was available to work full or part-time, day or night; and

j) That Eazor's employment profile indicates an under-utilization of women in its workforce generally and specifically at the West Middlesex terminal.

12. Jackson, having been discriminated against by Defendant, is entitled to an award of back pay including all benefits that flow therefrom. *Albemarle Paper Company v. Moody,* supra.

13. The appropriate standard for measuring backpay liability is the difference between actual wages earned for each quarterly period by the discriminatee and the wages she would have earned in the position to which she was discriminatorily denied employment. *Albemarle Paper Company v. Moody,* supra; *National Labor Relations Board v. Seven-Up Bottling Company of Miami,* 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953).

14. Jackson's backpay award should encompass the period from June 28, 1976, until the date of this decision.

15. The backpay award shall be reduced by any unemployment compensation received by Jackson during this period. *Ostapowicz v. Johnson Bronze Company,* 541 F.2d 394 (3rd Cir. 1976).

16. The backpay award shall include interest at the rate of six (6%) per cent compounded quarterly for the entire period.

17. Jackson is also entitled to reinstatement to a position commensurate with her skills, training and experience, at a rate of pay she would have been earning but for the discrimination, plus seniority which would have accrued from June 28, 1976, and benefits which flow therefrom. *Franks v. Bowman Transportation Company,* 423 U.S. 814, 96 S.Ct. 25, 46 L.Ed.2d 32 (1976); *Beaz-er v. N.Y.C. Transit Authority,* 558 F.2d 97 (2d Cir. 1977).

## DISCUSSION

One aspect of this case deserves some in-depth discussion. This Court would like to make it clear that it rejects the Motion set forth in *Ross v. Jones & Laughlin Steel Corp.,* 468 F.Supp. 715, 719 (1979) that, " . . . . the natural, reasonable, and legitimate desire of an employer to hire qualified experienced over-qualified inexperienced people to fill job vacancies . . . . " is a legitimate non-discriminatory reason for rejecting a female applicant for employment in favor of a male applicant in every case.

This Court can properly take judicial notice of the undeniable fact that men as a group have had considerably more working experience in the industrial work place than women. However, the extent of one's experience on a particular job, does not necessarily mean that said person is more competent than a person with less experience. In fact, there are literally thousands of people in the work-force who for various reasons (physical and mental) are much more competent than their fellow-workers who have much more experience. It follows, that the extent of one's experience in a certain job classification, without more, is of course an indication of some competency as to that occupation, but the extent of one's experience, on a certain job, standing alone, is far from being conclusive in weighing the relative competency of two applicants for the same job.

Further, since men on the average, have had over the years a greater opportunity to gain experience in various job categories than women who are as well or better qualified to do the same jobs, the rule "of qualified experience over qualified inexperience" as advanced in the Ross Case (cited Supra) would serve as a legitimate ready-made pretext for excluding women from employment opportunities, especially in heavy industry.

The rationale of the Ross Case, if applied to the facts of this case, would lead to a gross injustice.

The testimony was clear in this case that the employer, Eazor Express, in the usual employment situation, hired on the basis of competency and seniority, and it is undeniable that this is the usual rule throughout industry where the seniority system prevails whether by collective bargaining or otherwise.

Here the claimant–female, Jackson, had more seniority than the male Rogers, and she was admittedly competent to do the work.

In the usual industrial work force, where an employee seniority system is in place, a less senior (in terms of length of time in service with the company) but more competent and/or experienced employee is never given precedence in a call–back from furlough status over a fellow competent employee with more service seniority but with less experience. To do otherwise in the name of preferring the "more experienced" employee over the less experienced employee (even though the less experienced employee might be the most competent) would undermine the whole concept of employee "seniority rights".

If, as is contended for by the Defendant Eazor, a furloughed competent female employee with more seniority than a male applicant, can legally be displaced by the male as an employee, merely because the male has more experience, and/or more competence, then Title VII will be in effect rendered nugatory and will fail completely in one of its avowed purposes, i. e., to prohibit discrimination with respect to employment opportunities because of sex.

This Court rejects the Ross rationale as applied to this case, and further, this Court seriously questions the applicability of the Ross rationale in any case for the reason that it aids and abets an employer who is bent on carrying out a sexually–biased employment practice in the course of his business under the guise of hiring the more experienced male worker in preference to a female worker, who, although she may be less experienced, is nevertheless competent to do the job; or as competent as the competing male for the job; or even more competent than the competing male for job.

This Court, for the above reason, among others, as heretofore set forth in the Findings of Fact and Conclusions of Law, finds in favor of the Plaintiff.

## ORDER

AND NOW, this 24th day of OCTOBER, 1980, upon consideration of the foregoing Findings of Fact and Conclusions of Law, IT IS ORDERED, ADJUDGED AND DECREED THAT:

1. Judgment is hereby entered for the Plaintiff finding that Defendant violated the civil rights of Dixie Lee Jackson as protected by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; in the areas of layoff, recall, assignment and classification of jobs and training.

2. Defendant, its agents, managers, successors and assigns are permanently enjoined from discriminating against current and future female employees because of their sex at the Defendant's West Middlesex terminal.

3. Defendant shall take the following actions to swiftly and effectively correct the discriminatory conditions at the West Middlesex terminal:

a. Defendant shall develop a program of affirmative action to increase the number and percentage of qualified females working at the West Middlesex terminal in all job classifications;

b. Defendant shall recruit, hire and train females;

c. Defendant shall inform all recruitment sources of its interest in recruiting, hiring and training females;

d. Defendant shall advise its female employees of all available positions and training opportunities;

e. Defendant shall provide to female applicants for employment a list of all job openings; and

f. Defendant shall request all female applicants to complete a written job application. These applications shall be maintained for at least one year. Defendant shall make a good faith effort to hire from the applications retained.

4. Defendant shall offer Dixie Lee Jackson, by registered mail, the next available position at the West Middlesex terminal in any of the following or similar job categories: General Clerk; Overages, Shortages & Damages Clerk; Accounts Receivable Clerk; Tracing Clerk; Billing Clerk; Manifesting Clerk and Statistical Secretary. The offer shall be at a salary no less than the rate she would be earning had she been recalled in June 1976. Dixie Lee Jackson shall have twenty (20) days from the date of her receipt of the offer in which to accept or reject the offer. If Dixie Lee Jackson accepts the offer, she shall be given her original hire date for the purpose of all benefits and compensation. Dixie Lee Jackson shall be given a minimum of sixty (60) days training on any job she accepts.

5. Within ten (10) days after receipt of this Order, Defendant shall:

a) Deliver to the Regional Attorney, Equal Employment Opportunity Commission, Philadelphia District Office, 127 N. Fourth Street, Suite 200, Philadelphia, Pennsylvania 19106, a check in the amount of Thirteen Thousand Three Hundred Nineteen ($13,319.12) and 12/100 Dollars, made payable to Dixie Lee Jackson;

b) Expunge from Dixie Lee Jackson's personnel records any unfavorable or adverse personnel comments. Defendant shall not disseminate, directly or indirectly, to any employer or any potential employer of Dixie Lee Jackson any facts, comments or circumstances which might be interpreted as unfavorable or adverse to her.

6. Plaintiff is awarded costs.