Elaine TRUSKOSKI

v.

ESPN, INC.

Civ. No. 2:90cv00059 (PCD).

United States District Court,
D. Connecticut.

April 26, 1993.

Joseph D. Garrison, and Gary E. Phelan, Garrison & Arterton, New Haven, CT, for plaintiff.

Marcia K. Keegan, and William J. Doyle, Wiggin & Dana, Robert B. Hempstead, Donahue and Hempstead, Hartford, CT, Philip L. Steele, Hartford, CT, for defendant.

## MEMORANDUM OF DECISION

DORSEY, District Judge.

Plaintiff was employed by defendant from 1982 to 1987, during which she advanced to Executive Secretary II, and worked for Mr. Connal. Connal was demoted and ultimately terminated. When he was demoted, her grade was reduced. She continued as his secretary until he was terminated. She was then required to find another position, failing which she was terminated. She claims that the failure and refusal to place her in available positions and her termination were retaliation for her complaint about the grade reduction policy. She seeks back pay, compensation for lost benefits, front pay, reinstatement, punitive damages and attorney fees.

## I. Facts

1) Plaintiff was temporarily employed by defendant in 1981.

2) She was hired full time in 1982. Thereafter she was successively promoted and increased in salary reflective of her performance which was always graded highly. Exs. 8, 11, 38.

3) Job grades were correlated to permissible salary ranges.

4) In September 1984, she became Executive Secretary II to Connal, Executive Vice President and Chief Operating Officer. Substantial qualification and responsibility were required. She was a grade 9 with a salary range of $15,484 to $26,000. With a merit raise, plaintiff was paid $17,365.

5) As of September 1986, plaintiff's salary was $20,412.

6) Connal was eased out and his job ended in early 1987.

7) Without notice, plaintiff was regraded an 8, the grade of all Vice–President's secretaries, without loss of salary.

8) Defendant pegged the grade of secretaries to the level in the company hierarchy of the person for whom they worked.

9) Plaintiff has, and does, contend that, by reducing her grade, she was demoted without regard to her performance. She was removed from the office where she had worked for Connal and enjoyed an executive level secretary's perks. Notwithstanding Connal's demotion, he and plaintiff continued to perform many of their prior duties until he was terminated and her position was eliminated. Connal's termination was regarded as confidential until it was announced in early 1987. Until then plaintiff was precluded from seeking other jobs.

10) Plaintiff filed a claim of discrimination with the Connecticut Commission on Human Rights and Opportunities (CHRO) and the Equal Employment Opportunity Commission (EEOC), claiming that the lowering of a secretary's grade coincident to a demotion of her boss, without regard to her performance,

applied only to jobs held by females and thereby discriminated against them. For doing so, she claims ESPN retaliated.

11) EEOC issued a right to sue letter. Plaintiff sued.

12) The parties later stipulated that such downgrading would be terminated and the complaint was withdrawn.

13) Mr. Farley, defendant's Director. of Human Resources, advised plaintiff that unless, by April 24, 1987, she had found another company position, she would be terminated.

14) There was no articulated derogation of plaintiff for her criticism of defendant's policy of secretarial grading.

15) There was no evidence of any instruction or articulation by defendant that caused a failure to offer plaintiff a job.

16) Grading, with attendant salary ranges, standardizes salaries for employees in comparable jobs. Salaries occasionally exceeded the ranges. A downward grade change reduces potential salary increments, even when caused by a change in position. Ex. 39.

17) Plaintiff attached significance to her grade beyond the monetary considerations and was quoted as focusing in part on the prestige, the aura, the perks, the posture in the work place, and the intangibles of higher grades. She argues that the practice. of grade reduction was discriminatory on the part of defendant.

18) Mr. Scanlon, on or before March 16, 1987, offered plaintiff either of two secretarial positions, one at grade 7, the other at grade 6. Less skill and responsibility were required in both jobs. Plaintiff did not accept the offer to be Scanlon's secretary because it was a grade 7. Though no loss of salary resulted, increases would have been restricted to the lower grade range. Her concern with status may have clouded the issue. No effort was made to clarify her concern over her grade or the practice which was noted by Kemmler as at least causing bad public relations. That view, voiced to Farley, clearly implicated an impact of a practice not just on plaintiff and with overtones of discrimination. Defendant's employ-

ment of male secretaries was suggested but none was identified. See Ex. 32.

19) Scanlon conceded that plaintiff's "rejection" of the job, initially, was followed by an acceptance which he rejected as lacking commitment and due to a purported sense that plaintiff was not reliable in keeping confidences. His claim that Connal's knowledge that plaintiff was being considered to be Scanlon's secretary reflected her leaking confidential information is absurd. Plaintiff functioned as Scanlon's secretary, in part until March 27, 1987. The suggestion that Scanlon needed authorization to offer plaintiff a position is not credited. An outside applicant was hired as Scanlon's secretary.

20) A position as Coordinator, International Sales was created. Plaintiff purportedly was considered. See defendant's TPO compliance, Part D, § A–2, ¶¶ 25–27, 93–96; see ¶ 97. Per Colleen Murphy, the job was committed to Ms. Deckert. Plaintiff was neither considered nor interviewed for qualification, contrary to Farley's contentions and ESPN policies to interview all qualified candidates, to hire based on qualification, to encourage career growth of employees by advancing to more skilled and rewarding jobs, and to hire from within where possible.

21) Plaintiff was offered a staff secretaryship in the legal department. She did not immediately accept it to explore other opportunities. On March 27, 1987, she announced a willingness to accept the job but it was then claimed to be no longer available, a dubious claim in view of contrary evidence from Farley. A Ms. Schumacher, who demanded, and received, more money than had been offered, was hired. Plaintiff was not assured that the job would be kept open. On March 31 a legal secretaryship was posted but was filled by an outside applicant with less, or certainly no better, qualification, contrary to ESPN policies. Another legal position came open while plaintiff was on vacation, but she was not informed, interviewed or considered though then on record as being interested. An outside applicant was hired.

22) The suggestion that plaintiff's trustworthiness was in doubt is not credited. No substantiation was offered and the testimony concerning same lacks merit. But one

source for the doubt was cited without corroboration or confirmation. Kemmler had no legitimate basis to be so concerned. In none of plaintiff's work had this been questioned previously. She recorded the confidential negotiation of Connal's reassignment and termination without compromise. Kemmler's reliance on her preference for another department over legal pales against the different treatment of a Ms. Culos in comparable circumstances.

23) None of the asserted grounds for not placing plaintiff in open positions was articulated to Farley or to Conway who claims that all reasonable efforts to place plaintiff were made. The potential of other jobs, *see* memorandum of 4/7/87, Ex. B, and ¶ 119 of part D, TPO compliance, was unexplained. The intervention of Grimes, ¶ 7, memo of 3/27/87, Ex. B, was unexplained as was his direction "to move [plaintiff] out earlier."

24) A secretarial position in Remote Productions opened in April 1987. Plaintiff was interviewed but the job was given to an employee with less experience but purportedly more enthusiasm. It was suggested that plaintiff was overqualified. Actually Mr. Anderson had two job openings, replacement of his secretary and a staff secretary at grade 7. Though professing interest in plaintiff, the failure to appoint her was explained by the filling of the first job, with no apparent consideration of her while making available only an "entry-level" job. Once again she is claimed to have refused the job as beneath her, but when it was accepted, she was refused it for want of genuine interest. It was given to Ms. Lacombe who had less experience and skills. Exs. BB, QQQQ. The justification, that typing was less involved, is not credited in view of the job description, Ex. BBB, and Anderson's inconsistent testimony. Plaintiff's alleged want of enthusiasm is not credited as a reasonable basis for excluding her. Her job attitude was universally described as positive. The claim that her qualifications were compared to the hiree, Tr. 207-08, is not credited because the choice is illogical in that respect.

25) An executive secretary for Mr. Bornstein, involving some commuting to New York, opened in late March. It was posted but not discussed with plaintiff, who had traveled in prior jobs. Plaintiff did not apply, though the job was posted. She could not have refrained from applying because the appointee had been "pre-selected" since she did not learn of the "pre-selection" until later. Plaintiff's TPO compliance, Part D, answer to ¶ 139. Bornstein's disclaimer of plaintiff's availability for this job is not credited. Contrast Defendant's Part D, TPO compliance, ¶¶s 136 and 141, along with his professed effort to encourage her placement. His favorable impression of her work, positively contrasted by Connal with the hiree, does not square with the failure to consider her for the job.

26) Plaintiff offered no direct evidence of retaliatory or discriminatory animus involved in an adverse employment decision.

27) Plaintiff's employment was terminated April 24, 1987.

28) Plaintiff was paid unemployment compensation in 1987 for 26 weeks, a total of $5100. Her total earnings from employment since April 24, 1987 has been $720 for approximately two weeks in May, 1987. She claims back pay only until June 30, 1989.

29) Plaintiff claims to have enlisted the aid of three agencies and one temporary work agency; checked three newspapers' want ads and sent résumés in search of work. She has no documentation of contacts with specific possible employers, and was unable to testify as to such specifics. Two job references from the Department of Labor are not shown to have been pursued.

30) Plaintiff vacationed for three weeks in 1987, four in 1988, seven in 1989, four in each of 1990 and 1991 in Florida, Hawaii, and Europe. From April 1987 to at least February, 1989, she was actively involved in construction of a family home.

II. *Discussion*

A. Liability

■ The circumstances giving rise to this action cannot be discerned with precision because they occurred over a period of time, almost six years ago, when the parties were not focused on precisely what was then said,

thought and done. So, like viewing paintings of impressionists, deciding from the evidence what occurred, was said and was done is not assuredly accurate. The process is further blurred by the presentations which stress the favorable. Thus plaintiff complains of an affront, near the end of her employment, by relegation to a garage location for her desk. Defendant's characterization classically describes plaintiff's work station as a building which also contains a separated area for vehicle storage. On the other hand, when a job seemingly was made available to her, plaintiff denies that it was actually offered and though she didn't accept it denies that she rejected it, blithely assuming she had a continuing, unlimited right to accept it. Beauty is in the eye of the beholder. Plaintiff did not promptly and positively respond to job opportunities with defendant, but immediate acceptance was not demanded.

Plaintiff commenced as a secretary for ESPN in 1981. Defendant's secretaries come to perform administrative duties for those to whom they are assigned. Plaintiff acclimated well to her duties, secretarial, administrative and quasi-executive. There was no evidence of deficiency in any aspect of her performance.

As secretary to Connal, she was located in what might be called a prestigious environment. Privileges apparently came with the job along with an intangible status which tended to feed her ego. Though she "had arrived," it was not for long. In the large company vernacular, Connal was reorganized out of the company and no single person was designated as his replacement. He was ousted from his executive suite, reduced in duties ultimately to a point where, seemingly having nothing to do, he stopped coming to the office. Plaintiff got lost in the shuffle. She was in limbo while Connal's departure was negotiated in confidentiality, to preserve which she was unable to look for alternative assignments. She was moved out of the posh office. She was given temporary assignments.

She learned that her grade, a 9 as Connal's secretary, was reduced because she was no longer in a grade 9 position. Looking upon the reduction as a demotion not resulting from her job performance, she regarded it as unfair. She further manifested considerable chagrin at being displaced from the status she had previously enjoyed and relished. She came to see that the ESPN policy, or practice, by which she had been reduced in grade, applied only to secretaries. Since secretaries were all women, the policy/practice was seen as impacting, if not directed at, only females. She complained about the policy/practice. While it cannot be said to have been crystal clear to each in ESPN's chain of command to whom she spoke—Scanlon, Kemmler, Farley and Conway—that she was asserting gender bias, it did not require too much thought to realize that while her complaints were substantially self-focused, her complaint had definite overtones of gender bias and discrimination. To oppose a policy or practice and benefit by the protection of Title VII, plaintiff had to have believed she was confronted by sex discrimination. Thus it should not have been a total surprise when shortly after her termination a discrimination claim was filed with CHRO.

Plaintiff here claims not discrimination, but that having made a colorable claim of discrimination, defendant retaliated for her doing so. Retaliation is claimed in the form of forcing the termination of her employment, ostensibly because she was not then filling an established position, by failing and refusing to provide her with a position after her position as Connal's secretary was terminated. Defendant answers by suggesting that jobs were offered, but her vanity as to the privileges of executive level employment caused her to refuse them and alienate others by acting as if those jobs were beneath her.

██ It is unlawful to impose unfavorable employment conditions or to make unfavorable employment decisions to retaliate against an employee who protests, or seeks to correct, discriminatory practices. 29 U.S.C. § 623(d); *Grant v. Hazlett Strip–Casting Corp.*, 880 F.2d 1564 (2d Cir.1989). Yet an employee has no legally enforceable "right to a particular job status or label." *Frost v. Chromalloy Aerospace*, 697 F.Supp. 82, 86 (D.Conn.1988). Retaliation has three elements; the employee's engagement "in a protected activity" known to the employer,

an adverse employment decision and "a causal connection between the protected activity and the adverse employment decision." *Malarkey v. Texaco, Inc.,* 983 F.2d 1204 (2d Cir.1993); *Manoharan v. Columbia Univ. College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988); *Johnson v. Palma,* 931 F.2d 203, 207 (2d Cir.1991).

Plaintiff's complaints, though informal, were recognizable as complaints of gender bias and constitute protected activity. *Sumner v. U.S. Postal Service,* 899 F.2d 203 (2d Cir.1990). *See Graham v. Texasgulf Inc.,* 662 F.Supp. 1451, 1462 (D.Conn.1987), *aff'd,* 842 F.2d 1287 (2d Cir.1988). She protested what in good faith she saw as unlawful conduct, *id.,* though not so adjudicated and not here pursued. Plaintiff has thus met the first burden of proof and, as she was thereafter terminated, so also the second.

The question of a causal relation between her termination and her complaints is difficult as there is no direct evidence of statements or conduct explicitly or unquestionably reflective of a retaliatory motivation. While in limbo, plaintiff was offered several jobs, none of which has been shown to have been a sham. Such would not preclude a finding of retaliation if the final action was adverse and was retaliatory. The offers tend to suggest the absence of a planned total boycott of plaintiff for it is less than likely that several high-level employees making employment decisions would, at one moment, offer a job which could have been accepted on the spot, only thereafter to refuse to make the job available on a ground that would seemingly have been equally available at the first offer.

. The question of causal connection is significantly a matter of timing, *see DeCintio v. Westchester County Medical Center,* 821 F.2d 111, 115, (2d Cir.), *cert. denied,* 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987), citing *Davis v. State Univ. of New York,* 802 F.2d 638, 642 (2d Cir.1986), and contrast of the reasons for the decisions not to hire with plaintiff's prior performance. The imposition of the deadline, by Farley, is innocuous in itself. Further there is no showing of an umbrella-like mandate, from on high, directing plaintiff's non-hire. That she worked for the deposed Connal cannot be ruled out as a possible bias. Her proficiency was unquestioned. She was universally accorded high praise. An obvious corporate asset, a well-trained, capable employee, would be lost if she was not found a job. Defendant's witness, the employment agent, Mr. Stewart, said as much. There was every reason, from an employer's point of view, to keep her in defendant's employ. Nonetheless there was the personality problem, her focus on status, privileges, prestige. That quest was clear, but it presented a problem of personnel relations, not a sound ground for allowing the loss of a corporate asset. It would be a rare employee who was not rubbed the wrong way by a co-employee who was cloaked with the conceit of her own self-importance. Yet employers do not allow minor frictions to vitiate the value of a qualified employee, witness the inflated egos nurtured, tolerated, indeed fed by many corporations.

Looking closely at each employment opportunity put at her disposal, there are two factors that mandate the finding that plaintiff has shown the required causal connection. First, there is a hollow ring to the reasons for each job being snatched back from her. Second, there is a lack of a true overall commitment to find a position to keep her in ESPN's employment. *See* Ex. 64G, 64H. As noted above, Scanlon's rejection of her cannot be credited as the exercise of sound, objective, business-oriented judgment. While it might have been personal judgment, his reasoning is short of the requisite validity. The same is true of the decisions of Kemmler and Anderson. Overall, ESPN's conduct is deficient, for though protesting a wish, and effort, to keep her, little of effect was done. A corporate press to make available one of the jobs which was offered and then withdrawn did not occur. None of the individual decisions not to employ plaintiff was reviewed for validity nor was the corporate interest stressed to those decision makers. No one with a job available was pressed to take her. Bornstein's claim that he requested Scanlon's consideration of plaintiff is at odds with Scanlon's retraction of a job offer, his reasons therefor and his failure to discuss his doing so and reasons with Bornstein before the matter was finalized. Mere-

ly informing her of openings was not consistent with the professed wish to keep her. In short, allowing the deadline to pass and her termination to occur without a greater effort by responsible corporate officers to find a position for her is not in keeping with the logical, presumed, and here lukewarmly professed interest in doing so. It is akin to a welcomed, invited guest being told to find a seat at table with no effort to insure that one is found among the crowd. From the foregoing it is inferred that a retaliatory motive existed and that plaintiff has thus met her third burden of proof of a causal connection.

 We turn to defendant's obligation, at this point to "produce evidence of a non-retaliatory reason for its employment decision." *Malarkey*, 983 F.2d at 1213. ESPN has offered evidence of plaintiff's personality, focus, sense of what was important to her, the offer of jobs and effort to aid her in finding one, the reasons for not offering her jobs when she belatedly sought to accept them and the lack of any corporate direction not to hire her. Defendant argues that inferences reasonably drawn, as well as such not reasonably to be drawn, suggest a business-as-usual approach in her case, in which she was not singled out for special attention of a negative nature. As discussed above, the implication remains that defendant allowed several employees to refuse to place her in open positions, for reasons that were clearly less than objectively sound and contravened the best interests of the company. Absent a real effort, reasonably consistent with company policies to hire from within, Ex. 22, and to interview all qualified applicants, and its best interests in keeping employees who had performed well, despite some personality quirks, something pervaded the handling of plaintiff's quest for continued employment other than defendant's asserted business-as-usual dealing with her. Non-adherence to policies can evidence pretext in the proffer of non-discriminatory reasons for employment decisions. The closeness in time between plaintiff's complaints and the termination of her employment without showing that it was based on sound, objective implementation of the employer's interests, reasonably permits the inference that a retaliatory motivation was involved. That inference is reinforced by the placement in the open positions of less qualified and new employees without a showing of such higher quality in those actually appointed as to justify the choice except that it was made on the basis of factors other than the best interests of the employer. *See Cowan v. Prudential Ins. Co.*, 703 F.Supp. 177, 187–88, (D.Conn.1986), *aff'd*, 852 F.2d 688 (2d Cir.1988). Considering all the evidence, plaintiff has proven that retaliation, born of her complaints, was a substantial factor in the failure to place her in one of the several positions which were, or became, open before she was terminated. She has thus met her burden. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *Davis*, 802 F.2d at 642. Defendant has reduced the assuredness in this finding but it has not proven "by a preponderance of the evidence that it would have made the same decision even if it had not taken the illegitimate factor into account." *Grant*, 880 F.2d at 1568, citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S.Ct. 1775, 1795, 104 L.Ed.2d 268 (1989); *see Berl v. County of Westchester*, 849 F.2d 712, 714–15 (2d Cir. 1988). This is not a judgment on defendant's business decisions but a finding that, as contrary to its interest in keeping employees whose performance has served its interests, the course of conduct which led to plaintiff's termination was probably based, in substantial part, on a retaliatory motive.

## B. Relief

### 1. *Backpay*

 One wrongfully terminated is entitled to any loss of income caused thereby. The end of employment and its concomitant loss of income may result in a recoverable economic loss. *Sivell v. Conwed*, 666 F.Supp. 23, 25, (D.Conn.1987). A terminated employee must mitigate such loss by a reasonable effort to find substantially equivalent employment. 42 U.S.C. 2000e–5(g); *Ford Motor Co. v. EEOC*, 458 U.S. 219, 226, 102 S.Ct. 3057, 3062, 73 L.Ed.2d 721 (1982); *Dominic v. Consolidated Edison of New York, Inc.*, 822 F.2d 1249, 1258 (2d Cir.1987). Proof of a failure to mitigate falls to defendant. *EEOC v. Kallir, Phillips, Ross, Inc.*, 420 F.Supp.

919, 926 (S.D.N.Y.1976), *aff'd,* 559 F.2d. 1203 (2d Cir.), *cert. denied,* 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977). A claimant is entitled to be reimbursed for any loss caused by the unlawful employment action of defendant. Back pay is ordinarily measured by the difference between the wages that would have been earned but for defendant's wrongful action and what was actually earned together with what was earnable with reasonable diligence. 42 U.S.C. § 2000e–5(g). Any unemployment compensation benefits received are properly offset. *Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 47 (2d Cir. 1980) (appropriate and within the guidelines of *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975)); *EEOC v. Steamfitters Local 638,* 542 F.2d 579 (2d Cir.1976), *cert. denied,* 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977); *see NLRB v. Gullett Gin Co.,* 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337 (1951). While collateral sources are not offset, unemployment compensation is not from a source independent of the employer who indirectly pays such benefits in substantial part by levies under Conn.Gen.Stat. §§ 31–225 *et seq.* Making a person discriminated against whole is not achieved by awarding damages in excess of the actual loss when the excess does not come from a collateral source. *See EEOC v. Steamfitters Local 638,* 542 F.2d at 592.

■■■■■ Plaintiff was earning $20,412 when she was terminated. There was no evidence of enhancement of that amount. She was then a grade 8 with a salary range of $15,300 to $24,500. She had received annual merit increases, averaging $1,575. Except for one short employment, netting her $720 for 2–3 weeks, she was out of work until June 30, 1989, when she concedes she stopped looking for work. Her hope for reinstatement does not justify less than a conscientious effort to find work. *See Miller v. Marsh,* 766 F.2d 490, 492 (11th Cir.1985). A ritualistic compliance with the unemployment administrator's work search requirement does not necessarily constitute a reasonably diligent search for suitable employment. She received full pay for four weeks, as severance, and $5304 in unemployment compensation after May 1987, for 26 weeks.

Her testimony about her job search and her other non-employment activities from May 1987 to June 1989 does not suggest the diligent effort to find reasonably equivalent work required to permit a finding that she mitigated her damages. *Anastasio v. Schering Corp.,* 838 F.2d 701, 708 (3d Cir.1988). The testimony of Stewart, which is credited, strongly suggested that a reasonable effort, and availability, on the part of plaintiff, would readily have enabled her to find work comparable in nature, with her experience, in responsibility, status and with a reasonable expectation of advancement, perhaps indeed at increased compensation, in 1987, 1988 and 1989. His assertion that she could have been employed through those years, and within a month of seeking and making herself available, suggests that at most she would have lost a month or two due to unemployment. She would potentially have had to commute to Hartford, from her home in Harwinton, a 45 minute drive, not an unreasonable condition of employment. If she is credited with four months of unemployment, then she would have lost $6,804, gross. However, she was paid for four weeks by defendant, as severance, a total of $1,570. Adding her earnings of $720 and unemployment compensation of $5304, she received $7594 during the period she claimed she was out of work. As this exceeds the amount of her legitimate loss, $6,804, she is not entitled to back pay. Had she made a diligent effort to find work, while the amount she would have received in unemployment compensation would have been reduced, it would have been offset by the amount she would have earned. She has not proven a loss of work as a result of her termination for more than four months, but otherwise would have been able to find and have work for the entire period to June 30, 1989. For these reasons no back pay is awarded.

### 2. Reinstatement

■■■■■ Reinstatement is a complete remedy as it vitiates the wrongful act. It stops any further negative impact on the employee's status. Though it alters defendant's obligations, it gives the employer the benefit of the claimant's work at the same

time as the employee is paid. Here, defendant is not shown to be seriously encumbered if reinstatement is ordered. The evidence reflected substantial shifting and new employees being hired in the secretarial ranks. While reemploying plaintiff above new entry positions may require some adjustment on the part of defendant and other personnel, it would be neither insurmountable nor overwhelmingly disruptive. Allowing a period of adjustment in which to settle plaintiff appropriately could resolve any disruption. Plaintiff's termination has not been shown to have been rancorous, fraught with animosity, marked by compromise of defendant's interests, reflective of long-standing or lasting frictions or marred by deficiencies in plaintiff's performance. It is true that this litigation has generated publicity, some of which has been negatively reflective of defendant and plaintiff has not been exactly close-mouthed nor wanting in exaggeration on the subject. *See* Ex. PP. While events since April 1987 will require some modifications of attitudes of ESPN's personnel and of plaintiff, her sense of responsibility is presumed to suffice to insure her performance of her duties consistent with the obligations to her employer.

Accordingly, defendant is ordered to reemploy plaintiff at a grade which would permit her salary to be fixed at $29,862, that being her salary at termination plus six increments for the employment anniversaries since April 1987. Defendant shall place plaintiff in a position of staff secretary or its equivalent at the earliest possible date, but no later than July 1, 1993, and in the interim shall utilize her services commensurate with her skills and experience. Plaintiff shall be considered for future advancement, promotion, salary increases and reassignments based on merit, qualification and defendant's employment needs, without distinction from other employees.

### 3. *Attorney's fees*

As a prevailing party plaintiff is entitled to an award under 42 U.S.C. § 2000e–5(k). Plaintiff shall, within ten (10) days hereof, submit any application therefor with proper substantiation. Plaintiff's counsel shall make its books and records that substantiate the application available to counsel for defendant. Defendant shall file any objection to such application not later than 20 days herefrom.

SO ORDERED.