Derek E. **DAVIS**, Plaintiff,

v.

**RUTGERS CASUALTY INSURANCE CO., Defendant.**

**Civil No. 94–2788(JBS).**

United States District Court,
D. New Jersey.

May 6, 1997.

As Corrected June 5, 1997.

---

Sidney I. Gold, Lovitz & Gold, P.C., Philadelphia, PA, for Plaintiff.

Martin Gringer, Robert G. Lipp, Franklin & Gringer, P.C., Garden City, New York, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SIMANDLE, District Judge:

Plaintiff, Derek E. Davis, alleges that his former employer, defendant Rutgers Casualty Insurance Co., discriminated against him on the basis of his race when Rutgers terminated his employment, in violation of Title

VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Mr. Davis, who is African American, was fired from his job as a claims examiner in the defendant's Bodily Injury unit, just one week after Rutgers' President, Brian Hollander, had personally approved Davis' request for reassignment to the claims examiner position. Mr. Hollander changed his mind, citing dissatisfaction with Davis' job performance in his former role as supervisor of the PIP [Personal Injury Protection] Unit as the reason for firing Davis on December 4, 1990. Plaintiff Davis alleges that Rutgers' reasons for firing him are pretextual, and he has produced evidence that his race was a substantial factor in his firing because the defendant's reasons are makeweight or even irrational, and because he was evaluated and berated more harshly than Caucasian unit supervisors, and because several top decision makers in the company (the owner, Nacham Stein, and the retained independent advisor, Milton Kligler) had displayed racist attitudes toward African Americans.

After two days of trial without a jury, concluding on January 8, 1997, the court has considered all testimony[1] and exhibits[2] and arguments of counsel and deliberated to a Verdict. For the reasons stated in these Findings of Fact and Conclusions of Law, which are hereby entered under Rule 50, Fed.R.Civ.P., the Court finds that plaintiff Derek Davis has proved, by a preponderance of the credible evidence, that race was a motivating factor in defendant's decision to terminate his employment. As a remedy, the Court will award back pay and require defendant to reinstate Mr. Davis to the claims examiner position forthwith.

### FINDINGS OF FACT

Derek Davis, an African American male born on February 18, 1958, graduated from Virginia State University in Petersburg, Virginia with a B.S. Degree in Business Administration in December, 1981. He returned home to New Jersey and sought employment in the insurance industry. He was hired by Allstate Insurance as a claims trainee in October, 1982, and was promoted to claims representative in the bodily injury department. He left Allstate in December, 1985, to accept the job offer of defendant Rutgers Casualty Insurance Co., because he believed prospects for career advancement would be better in the smaller company.

At Rutgers Casualty, Davis was hired by Vice President Charles Lisby and Claims Supervisor Linda Spruill, both of whom are African American. His first position for Rutgers was as Bodily Injury Claim Examiner, at a salary of $23,000 per year starting in December, 1985. (Tr. 135.) His work as a claims examiner was highly regarded within the company, according to Claims Supervisor Linda Spruill (Tr. 57–59) and President Brian Hollander. (Tr. 255.) Davis became a "team leader" among the bodily injury claims adjusters. (Tr. 57.)

Meanwhile, by 1988 Rutgers Casualty, under its prior ownership, was having financial difficulties. Nacham Stein was part of a group called the American European Group that had assembled capital and was looking to buy a company as an investment. (Tr. 242–244.) Stein asked Brian Hollander to locate a company he could buy. (Tr. 242.) Stein had been introduced to Hollander through an American European Group board member who knew Hollander when Hollander served as a governmental affairs representative of the Aetna Insurance Company in Washington, D.C., in the 1980's. (Tr. 238, 242.) Mr. Hollander, a lawyer with a substantial background from the 1960's in community legal services and thereafter as a litigating lawyer with one of New England's largest law firms, and who also has worked 7 1/2 years with Aetna at a policymaking headquarters level (Tr. 236–242), had become a private entrepreneur and he accepted the task of locating a company for Mr. Stein.

Mr. Hollander located Rutgers Casualty, an insurance provider headquartered in

**1.** The transcripts of trial consist of two volumes, namely, January 6, 1997 for pages 1–229, and January 8, 1997 for pages 230–426. Citations to the trial record are in the form "tr. ——."

**2.** Plaintiff's exhibits in evidence will be referred to in the form "P.Ex.," while defendant's exhibits will be referred to as "D. Ex. ——."

Cherry Hill, New Jersey, and he became intensely involved in studying this opportunity and negotiating the purchase. (Tr. 242.) As the deal was about to be consummated, the New Jersey Insurance Commissioner released a report finding Rutgers to be nearly insolvent. Hollander negotiated with the Insurance Commissioner's office, which imposed conditions on the sale. (Tr. 244.) As one such condition, the new owners of Rutgers would be required to have an experienced consultant selected by the Insurance Commissioner on the premises, paid by Rutgers, to help guide the turnaround. (Tr. 244–45.)

Mr. Milton Kligler was selected to perform this role, as a person with a long insurance background who was said to have been instrumental in turning around other failing insurance companies. (Tr. 245.) Kligler was paid directly by Rutgers Casualty.

In late 1988, the sale was consummated. Nacham Stein became the owner, Brian Hollander became the President (replacing outgoing president Robert Lipkin after a few months), and Milton Kligler worked closely with Hollander to help decide what needed to be done to improve Rutgers' financial performance. (Tr. 245–247.)

The Hollander–Kligler management team brought about organizational changes. Discrete responsibilities were assigned to four departments—Claims, Underwriting, Administrative Functions (Accounting), and Marketing. The Claims Department was placed under the supervision of Linda Spruill, and the former Vice President for Claims, Charles Lisby, was demoted to claims examiner under Spruill, with no decrease in salary. Three Claims Department sub-units were established—Property Damage, PIP, and Bodily Injury [BI]—to process the different types of claims the company received. (Tr. 248–251.)

Plaintiff Derek Davis was selected as the supervisor of the PIP Unit in June, 1989 (Tr. 53, 135), when Jim McAttee became supervisor of the Property Damage Unit and Roseann Coyle became supervisor of Bodily Injury. (Tr. 253, 310). McAtee and Coyle are Caucasian. Davis, McAtee and Coyle reported to Spruill, who reported to Hollander.

Spruill, as noted, is an African American, and Hollander is a Caucasian.

The PIP Unit was new, and Davis was the first PIP Supervisor. The PIP Unit was responsible for receiving, evaluating and paying first-party claims by Rutgers' insureds for Personal Injury Protection, which under the law of New Jersey provides for payment of an insured's income loss and reasonable and necessary medical expenses incurred in treatment of personal injuries sustained in automobile accidents without respect to fault. Derek Davis was selected collectively by Hollander and Spruill (Tr. 77–78) because there was "a sense that . . . he was someone who could do the job," according to Hollander. (Tr. 255.) He had received favorable evaluations as a team leader in his claims examiner role (Pl.Ex. B and Tr. 57–59).

The PIP Unit received a deluge of files, both new and old. When Davis took over, there were about 1,500—1,600 old PIP claims pending, plus new PIP claims arriving every day, according to Linda Spruill's recollection (Tr. 56), while Davis recalls upwards of 1,800 claims initially pending. (Tr. 136–37.) The disparity in even identifying the initial PIP caseload is not surprising, because the PIP files were in disarray when Davis took over, and one of the first tasks was to organize and catalog the backlog. Under Davis' supervision, the caseload was cut to under 1,000 PIP files during his 18–month tenure. (Tr. 138.) Davis was not given a job description (Tr. 139), and Hollander never told Davis or Spruill that Davis' job was in jeopardy. (Tr. 65, 143, 146, 262, 267.)

According to his supervisor, Ms. Spruill, Davis' duties as PIP supervisor included instructing others in proper procedures, signing checks within his authority, and approving PIP payments, while supervising the work of the 3 or 4 claims examiners in his unit. (Tr. 54.) Davis implemented new procedures, such as systematic scheduling of independent medical exams (IME's) of PIP claimants after 90 days of treatment (Tr. 140).

Originally Davis divided the 1,600—1,800 files among his 4 examiners and himself (Tr. 141), but 3 examiners were lost within a few

months to go to other companies and the unit's work fell to Davis, and one examiner. (Tr. 137–38.) New examiners were assigned to the unit, such as witness Mary Jane Melini who came to the unit in February, 1990. (Tr. 118.) Ms. Melini testified she enjoyed working with Davis and found him to be a good supervisor who coordinated the efforts of the four examiners. (Tr. 119–122.) She never heard Hollander or any fellow worker complain about Davis. (Tr. 119.) The unit disposed of many of the old files. (Tr. 128–29.)

Davis received a supervisor evaluation as PIP supervisor on December 31, 1989. (Tr. 59–61, Ex. B.) His attendance was "excellent," he "can be relied on to always follow through," and his attitude was "enthusiastic, cooperative and friendly," according to that evaluation signed by Ms. Spruill. She also testified that she had no problems with his performance, and that she never told Hollander or Kligler that Davis was causing any problems as supervisor. (Tr. 62, 74–75.)

Davis's salary as PIP supervisor was increased from $34,500 to $39,000 in 1990. (Tr. 61, 160.) As PIP unit supervisor, Davis occupied a "hot seat," because the unit was always under scrutiny to perform. (Tr. 312.) Davis' PIP job was detail-oriented and the most intense and complicated, day-to-day, according to Hollander. (Tr. 285.) There were periodic meetings among Hollander, Kligler, Spruill, Davis, McAtee and Coyle, perhaps on a weekly or bi-weekly basis, in which the various claims units' files were discussed. (Tr. 311.) Hollander and Kligler would "tear apart" the various files, both from PIP and Bodily Injury, at these meetings (Tr. 314), according to Ms. Coyle's testimony. Hollander, too, recalls looking at PIP files "all the time" and discussing them at these meetings at which Spruill and Davis were present. (Tr. 258–59.) Although the

PIP files were criticized, there is no credible testimony that Hollander or Kligler criticized Davis' supervisory performance itself, such as by directing him to spend more time or be more careful. That occasional lapses occurred—such as paying a bill that should not have been paid, or failing to set up a medical exam at the appointed time—was inevitable in the nature of the business of processing a multitude of PIP claims. In fact, under Davis, the incidence of such PIP unit mistakes decreased over time, because Davis was concerned and took corrective action. (Tr. 108.)

One of the participants in the meetings, Roseann Coyle, has worked as supervisor of the Bodily Injury Unit for seven years. (Tr. 310.) She recalled that Kligler seemed to be especially harsh toward Davis when reviewing files, and Kligler's attitude toward Davis seemed to her to have a racist edge. (Tr. 354.) Kligler would go through Davis' desk and files at night, but did not go through the desks and files of white managers. (Tr. 354.) Coyle and Davis shared a large cubicle containing their work stations, and Coyle would often hear Kligler say hello to others by name but say to Davis, "How are you doing, Boy?" (Tr. 355.) Coyle found Kligler's attitude offensive and absurd. (Tr. 355.) Coyle testified that Kligler had uttered a derogatory statement about African Americans to her on an unrelated occasion in 1992 that confirmed her hunch that Kligler had racist views. When Coyle was late for a meeting in Newark with Kligler, she explained she had gotten lost driving and ended up going through some terrible slums in Newark, which were the worst conditions Coyle had ever seen. Kligler replied, "That's the way the *schvartzes* live," using the derogatory Yiddish word for black persons. (Tr. 357–58.) [3]

3. There is no doubt that the term "schvartze" or "schvartzer" was used by Kligler and by Stein, as discussed below, in a racist, derogatory sense. The entry in J. Ayto & J. Simpson, *The Oxford Dictionary of Modern Slang* (1992) states:
    schvartze(r) noun. Also sahwartze(r), etc. mainly U.S. rather derog. A Black person, esp. a Black maid.1961 -. [From Yiddish, from schvarts (German schwarz) black: the forms in final -r should represent the masculine, but the sexual distinction is commonly confused.]

The term is also categorized as derogatory in Leo Rosten, The *Joys of Yiddish*, in which Rosten writes, "shvartzer and shvartzeh, to mean Negro man and woman, became linside' words among Jews—cryptonyms for Negro servants or employees," as quoted in "An Earlier Jackie Mason Racial Slur against Dinkins is Disclosed," N.Y. Times, Oct. 2, 1989, at B1.

Hollander was undoubtedly influenced by Kligler's ideas about insurance administration. Kligler had much more insurance expertise than Hollander. (Tr. 362.) Hollander knew very little about claims processing, in the view of Spruill, who didn't think he had the requisite knowledge and experience. (Tr. 99.) Coyle, too, felt Hollander had minimal knowledge of handling claims. (Tr. 316.) Hollander worked in tandem with Kligler, playing a role parallel to Kligler in reorganizing the company, but with no intention at first of being involved. (Tr. 245–46.) It is only natural that Hollander would have trusted Kligler's judgments about Davis, perhaps not realizing that Kligler was assessing Davis's performance through a racist filter.

The other person Hollander consulted with about running the company was the owner, Nacham Stein, with whom he spoke by telephone 2–3 times weekly. (Tr. 264.) Stein did not become involved in the hiring or firing of individual employees, but he visited the office every few weeks (Tr. 264) and had met and spoken with Derek Davis on occasion. (Tr. 148.) Stein knew that the setting of loss reserves was a problem in the company, because an inadequate reserve results in an unanticipated payment of a claim from the current year's income. Stein would frequently discuss the problem with Hollander. Once when Hollander was away on vacation, in August 1992, he spoke with Stein who was again concerned about this problem. (Hollander Dep. 7/22/96 Tr. 123). In Hollander's absence, the duty of running the Claims Department and setting the reserves fell to Linda Spruill, who is African American. (Id. at 123–125). When Stein learned of Spruill's duties, he berated Hollander, exclaiming, "No *schartze*[4] is going to be making any decision with my money." (*Id.* at 125:16–17). The company's owner thus expressed his racist sentiment that no African American manager was fit to set his loss reserves or to pay claims. To his credit, Hollander revealed Stein's statement in his deposition testimony, and indicated he based his unfavorable opinion about Stein upon "the fact that he used that term, he described someone that way." (*Id.* at 126:11–15). Although Stein's state-

ment came almost two years after Davis was fired, it was directed against an African American manager, who was Davis' former supervisor, who, like Davis, had substantial authority to determine payment of claims. Stein's statement was categorical, and it applied alike to Davis, who had been an African American manager who as PIP Supervisor had been empowered to authorize checks and pay PIP claims "with [Stein's] money."

In November of 1990, Davis indicated he would prefer to return to his job as a claims examiner, stepping down from the PIP supervisor position. (Tr. 64, 146, 260, 313–314.) Davis asked to step down because he felt his policies were being undermined by Hollander and Kligler, and he was feeling frustration due to the unrealistic expectations Hollander and Kligler placed on the PIP unit. (Tr. 145–146.) Davis felt that Hollander had no understanding of PIP and the law requiring payments, and that Hollander's plans to reduce the PIP loss ratio were unachievable. (Tr. 176–77.) In time, Davis was proved to be correct, as the PIP unit's loss ratios were not thereafter reduced further.

Davis' request was approved by Spruill and by Hollander. (Tr. 86, 260, 370.) Hollander was fully familiar with the PIP files and Kligler's criticisms of Davis, but he had no plans to terminate Davis when he approved his transfer back to the Bodily Injury Unit. (Tr. 370.) Roseann Coyle, supervisor of Bodily Injury, recalled that she was "very happy" to have Davis back working in her department. (Tr. 314.)

Davis resumed functioning as a BI claims examiner. A week later, on December 6, 1990, Hollander told Spruill to fire Davis, to the shock of everyone, including Spruill (Tr. 64–65, 76, 97), Davis (Tr. 147, 167), and Coyle (Tr. 317–318, 369). The manner in which Hollander made the decision, and the reasons given for it, were so irrational and unlikely that they suggest the existence of an improper motive.

Hollander testified his change of heart came about during the week after Davis returned to the claims examiner position in the Bodily Injury Unit. He testified he spent

4. See n. 3, *supra.*

time talking with Davis' successor as PIP Supervisor, Leslie Braytenbah (Tr. 260, 286), and that he reviewed the unit's files one evening late into the night. (Tr. 260–261.) He testified he reached the conclusion that the quality of work done in the unit was worse overall than he had thought, and he felt he had made a mistake permitting Davis to be demoted to claims examiner while retaining the supervisor salary. (Tr. 261–262.) He felt that the files disclosed that medical exams of PIP claimants weren't being scheduled in an orderly way and that under Davis the PIP Unit had failed to collect PIP subrogation. (Tr. 261–263.)

Neither Hollander nor Rutgers Casualty identified any standards of performance that applied to Davis as PIP Supervisor, or explained how he failed to meet those standards. He had no job description, no articulated levels of performance or objectives to meet, and no quotas or goals for the unit's performance by which he would be evaluated. Whatever "standards" existed, Davis met them as PIP Supervisor and Hollander did not think otherwise at the time, even though Hollander would have liked more production from the PIP Unit. When he was no longer the PIP Supervisor, Davis was subjected to some unarticulated post-hoc standard of performance known only to Hollander.

Hollander did not consult Spruill or Coyle about Davis' performance or about his new plan to terminate him. (Tr. 65, 262, 270–271.) Both Spruill and Coyle testified that Hollander's firing of Davis was the one and only time in their years at Rutgers Casualty in which they were not consulted about the proposed termination of a subordinate employee's job. (Tr. 69–70, 97, 318.) Hollander admitted he never told Davis of his dissatisfaction with Davis' PIP unit job performance. (Tr. 277.)

Hollander made no record of the files he had allegedly reviewed and found deficient. (Tr. 272.) The defendant produced no records of any sort explaining the steps Hollander took in reaching the conclusion that Davis should be fired from the claims examiner position, and Hollander could recall making no list of files or any other record. Likewise, even when allegedly finding some deficiency in a PIP file during this night-time review, he testified he made no notation in or on the file of what had been overlooked or what needed to be done, which is itself unbelievable. Further, I find Hollander's testimony that his nocturnal file review contained some new revelation about Davis' management of the PIP unit to be incredible. Hollander and others had reviewed PIP files constantly, according to Hollander's testimony (Tr. 258–59), and he and Kligler well knew the PIP files and procedures all along. Hollander was detail-oriented and hands-on, by his own admission, and it is not conceivable that he could monitor Davis' performance as PIP supervisor for almost 18 months (June 1989 to November 1990) having no intention to terminate him, expressing no written statement of any personal dissatisfaction with Davis' performance, endorsing a raise for Davis in 1990, never telling Davis he was dissatisfied, and approving Davis' request for transfer back to the claims examiner position, and then profess to have suddenly changed his mind in a week due to the discovery of an alleged pattern of poor performance that was present all along.

Hollander's explanation for not consulting with Spruill is also highly illogical and incredible when he testified: "Because it was, I had concurred in the decision [to permit Davis' return to the claims examiner position] and I didn't think that she had made a mistake, I thought I had made a mistake ... I thought that [the transfer back] was the wrong decision on my part ... I just felt that that was the right decision for me to take. It was a higher decision than the decision that she should make and that's why I made the decision." (Tr. 262:20 to 263:4.) This explanation does not ring true because Spruill's job included evaluating Davis, and because Spruill had been a part of the process to demote and/or terminate significant employees in her area, including former Vice President Charles Lisby. Also, Spruill had more complete knowledge of the PIP unit, and no rational corporate president could fail to recognize that fact. The decision was so sudden, irrational and unexpected that Roseann Coyle immediately feared for her own job as the Bodily Injury Supervisor. (Tr. 369.) No

threats or adverse action were ever directed at Ms. Coyle.

Similarly, it was not rational to terminate an altogether satisfactory claims examiner for the perceived problems of the PIP unit that he had no longer supervised. Davis had been an excellent claims examiner, rising to the level of team leader, before his 1989 promotion to PIP supervisor. Likewise, when Davis returned to the claims examiner position, his new supervisor, Roseann Coyle, was delighted to have him working with her. While it may be understandable that Hollander did not want to keep Davis at a $39,000 supervisor salary after he reverted to claims examiner, he never considered the obvious option of reducing his salary by a few thousand dollars to bring it into line with other claims examiners of similar experience, because he was supposedly too "outraged at the overall quality" of the PIP files. (Tr. 300.) Again, this rationale makes no sense. First, there was nothing previously unknown to Hollander that could be gleaned from another examination of PIP files after he had been doing so all along. Second, the PIP files were, as a matter of fact, not in bad shape but had been greatly improved under Davis, as testified to by Spruill and Melini.

While it would be neither novel nor irrational to hold Davis, as supervisor, responsible for the problems of an underachieving unit, the fact is that under Davis the unit greatly reduced the PIP backlog, regularly scheduled medical exams, had become more prompt and responsive in claims processing, improved the morale of the unit's staff, and took steps for inventory control that had not existed before. By all accounts, the work of the unit is hard to supervise, and the unit's performance did not improve under Davis' replacement after Davis left the supervisor's job. In defending this case, Rutgers Casualty has instead grossly overstated the problems of the Davis-led PIP unit, while in fact at the relevant time in 1989–90 Davis had achieved a superior performance evaluation and a substantial increase in salary for his leadership. (P.Ex. B.)

On December 10, 1990, after being fired, Mr. Davis wrote to Mr. Stein (P.Ex. F) to ask him to review Hollander's decision, inviting Stein to speak with other employees about Davis' competence and loyalty. Stein refused to intervene on Davis' behalf.

Davis filed an administrative complaint of racial discrimination with the New Jersey Division on Civil Rights on January 8, 1991. (P.Ex. F). Defendants, represented by a law firm, responded to Davis' charge of discrimination on June 6, 1991. (P.Ex. J). This letter said that Hollander had been advised by Kligler and Spruill of a "deterioration in Mr. Davis' performance." (*Id.* at pg. 6.) The letter also said that Kligler and Spruill informed Davis "that his performance was unsatisfactory." (*Id.* at pg. 7.) These reasons were not true, as I credit Ms. Spruill's testimony that she never believed, nor did she ever tell Hollander, that Davis' performance had deteriorated or that it was unsatisfactory. (Tr. 73–75.) [5]

The Division on Civil Rights collected documents and performed interviews as part of its investigation for almost three years. On November 4, 1993, the Director of the Division on Civil Rights made a finding of probable cause to credit Mr. Davis' allegations of racial discrimination. (P.Ex. M.) Plaintiff timely filed the Complaint herein on June 13, 1994.

Several employment trends are worth noting. After letting Davis go, Rutgers has not hired another African American claims examiner. (Tr. 88.) Of the five African Americans occupying managerial or supervisory roles at or near the time Stein bought the defendant company (namely, Vice President Charles Lisby, Assistant to the President Barbara Wallace, Underwriting Co-Manager Marsha Jackson, plaintiff Derek Davis, and Director of Claims Linda Spruill), each person except Spruill was demoted or terminated from employment and replaced with a Caucasian (except for Wallace whose position was eliminated). Except in Davis' case, I

---

**5.** We do not have the benefit of Mr. Kligler's testimony because medical problems have precluded his taking part in this litigation. If, however, Kligler assessed Davis' work overall as unsatisfactory, he never expressed it to Davis or Spruill, and his opinion was infected by racial animus against the supervisor whom he called "Boy." (Tr. 354–355.)

make no finding that any or all of these personnel moves were racially motivated, and indeed there seems to be agreement that in Mr. Lisby's case the demotion was well-justified. The result, however, by the time that Davis was fired, was a company in which the managerial level, except for Linda Spruill, was Caucasian, which is consistent with Mr. Stein's view that no African American manager was fit to make decisions with his money, as discussed above. (Hollander Dep. Tr. 125:16–17.)

Davis' two co-workers in the best position to observe and know about his treatment—Spruill and Coyle—also testified to their impression that his race played a role in his termination. Neither Spruill nor Coyle expressed the belief that Hollander was a racist (see Spruill testimony at Tr. 91–93, and Coyle's testimony is silent on the point), nor must plaintiff prove that he was. Indeed, much in Mr. Hollander's personal and professional background includes efforts to assist people of diverse races as a former Legal Services attorney and board member. But both Spruill and Coyle believed, with good reason, that Davis would not have been dismissed if he were not African American. (Tr. 73, 319–321, 354–362.) Namely, Spruill testified that she strongly disagreed with Hollander's decision and believed that Caucasian employees who had made serious mistakes and whose performance was inferior had not been terminated. (Tr. 73). She further noted that the company's letter to the Division on Civil Rights had untruthfully stated that she advised Hollander that Davis' performance was unsatisfactory, and in truth she knew there was no legitimate reason to terminate him. (Tr. 74–76.) Coyle did not know whether Kligler played a role in personnel decisions, but she witnessed Kligler being unduly harsh to Davis, calling him

"Boy," and having a strong influence with Hollander and with major company decisions (Tr. 319–321, 354–362), and about two years later she heard Kligler's overt racist remarks that confirmed her suspicion of his racial bias against African Americans. She also knew that her Bodily Injury unit had continuing problems similar to the PIP unit, but that as a supervisor she was treated much better than Davis.

Defendant confronted Spruill with her deposition testimony that she had spoken to Hollander on occasion about mistakes made by Davis (Tr. 88–89), but she explained that these incidents were normal mistakes or oversights suggesting that Davis was "less than perfect" (Tr. 90), which is not inconsistent with her trial testimony. Likewise, defendant pointed Ms. Spruill to her deposition testimony that she "did not believe that race was the basis of Mr. Hollander's decision" (Tr. 92), which she satisfactorily explained on redirect examination as meaning that she had no evidence that Mr. Hollander made any statements against African Americans (Tr. 101). Spruill further explained that it seemed Caucasian employees had performed in an unsatisfactory manner without termination, and she was only speculating that the difference in Davis' case was his race. (Tr. 101–103.) In its totality, this deposition and trial testimony stands for the assertion of Ms. Spruill's belief that race played a part, without proof positive that it did. Overall, having had the opportunity to closely evaluate Ms. Spruill's demeanor and credibility, I find her testimony to be credible in all material respects.[6]

Likewise, the overall tenor of Mr. Davis' testimony was credible. He was articulate and responsive to all questions, without tending to exaggerate. One can see that Spruill's evaluation of him as "enthusiastic, coopera-

---

**6.** Defendant further suggests that plaintiff Davis "poisoned" Ms. Spruill's judgment in this case by sending her an excerpt of the Hollander deposition testimony about Stein's "shvartze" statement that had been directed at her. I credit her testimony that she was already aware of it through the office grapevine, and that in any event it did not change her view of the unfairness of Davis' firing. She had, for example, consistently refuted defendant's proffered reasons to the Division on Civil Rights during their investi-

gation, as memorialized in the finding of probable cause. See P. EX. M at ¶¶ C.1 & D.1. She has consistently believed Davis' termination to be unfair, long before she learned of Stein's "schvartze" statement about her. Further, it would be a sorry situation if a corporate manager or owner could undermine the testimony of an employee by hurling a racial insult at her and then arguing that his remark poisoned her objectivity.

tive and friendly" (P. EX. B) would still hold true today.

Plaintiff suffered loss of employment and diminished earnings due to defendant's racially motivated decision to terminate his employment. He is entitled to an award of back pay that places him as nearly as possible into the situation he would have occupied if he had not been injured by defendant's discrimination.

In 1990, at the time of his termination, Davis' annual salary was $39,000. If he had not been terminated, his pay as a claims examiner would have endured a wage-freeze for 1—2 years, according to Ms. Spruill (Tr. 96), due to austerity measures.

It appears from Ex. D–9 that compensation stagnated when a temporary wage freeze was imposed on all employees from 1993 to 1994, when a bonus incentive package was added. (See Memo of 3/17/94 attached to D. Ex. 8). Defendant's economic expert, Donald Welsch, also noted that due to financial difficulties, Rutgers Casualty announced no increases in compensation for 1993 and limited increases for 1994. (Ex. D–8 at p. 3). Therefore, it will be assumed that plaintiff's compensation for 1993 and 1994 would have been identical, before resuming a gradual climb to the current pay for bodily injury claims examiners of similar experience at defendant's company. According to D. Ex. 9, the range for the total salary and bonus for this position in 1996 for the employees whose service dates back to at least 1990 ranged from a low of $42,200 to a high of $47,900. Since the high figure represents the compensation of supervisor Roseann Coyle, it is logical to assume that Derek Davis' 1996 compensation would be at the midpoint of this range, namely $45,050, to preserve a difference in compensation between Coyle and her subordinate employee. If for sake of simplicity we divide the pay increments into equal steps, except that there is no increment between 1993 and 1994, plaintiff's projected rates of compensation become:

| Year | Amount |
|------|--------|
| 1990 | $39,000 |
| 1991 | 40,210 |
| 1992 | 41,420 |
| 1993 | 42,630 |
| 1994 | 42,630 |
| 1995 | 43,840 |
| 1996 | 45,050 |

His 1997 compensation will be assumed to increase by the same increment to $46,260 as of January, 1997.

Additionally, plaintiff lost benefits of health insurance premiums, for which he paid $2,418 (February, 1995 to May, 1996) and $1,920 annually (or $160 monthly) (May, 1996 through April, 1997) for total lost health benefit to date of $4,338. (See Plaintiff's Expert Report by Verzilli & Verzilli, P.Ex. U at 2.)

Also, his fringe benefits included employer contributions to his 401(k) plan in the amount of 2 percent of salary. (*Id.*) In 1990, for example, this benefit was worth $780, increasing to $951 in 1996, using the estimated annual compensation figures, above. The total compensation package value is computed as follows, to date:

| Year | Compensation | Health | 401(k) | Total |
|------|--------------|--------|--------|-------|
| 1990 (1 month) | 3,250 | | 65 | 3,315 |
| 1991 | 40,210 | | 804 | 41,014 |
| 1992 | 41,420 | | 828 | 42,248 |
| 1993 | 42,630 | | 852 | 43,482 |
| 1994 | 42,630 | | 852 | 43,482 |
| 1995 | 43,840 | 1,773 | 877 | 46,490 |
| 1996 | 45,050 | 1,925 | 901 | 47,876 |
| 1997 (4 months) | 15,420 | 640 | 308 | 16,368 |

Mr. Davis' *actual* earnings from December, 1990, to date followed an uneven course. He had no earnings for the remainder of 1990. For 1991, his earnings were $1,283 (P.Ex. U), of which $120 was derived from working as a substitute teacher, and the rest was derived from working in a clerical position part-time at low wage at his wife's place of employment, Coastal Associates. (Tr. 159–160.) He left that part-time job to join with a friend in a business selling gymnastics equipment, attempting to generate new sales, from which he derived no income or profit in a year's efforts. (Indeed, these self-employment efforts were reported as a loss of $1,688 for 1991 and $2,604 for 1992 on plaintiff's tax returns, (Exs. O & P)). He earned $16,540 in 1992, reflecting his employment, beginning in July, 1992, with Hertz Claim Management, which lasted through January, 1995, when Hertz closed this operation. His 1993 earnings were $37,003, and his 1994 earnings were $40,272. He earned $11,160 in 1995, reflecting a month at Hertz and new employment with Allstate since November, 1995 as a

temporary employee earning $20/hour. His 1996 earnings were $33,598 through November, 1996 ($3,054 per month), which will be annualized to $36,652. His January 1—April 30, 1997 earnings to date are also assumed to be $12,216.

The comparisons between projected earnings at Rutgers and actual earnings for the period December 1990 through April 1997 are as follows:

| Year | Projected Total | Actual Earning | Lost Income |
|------|-----------------|----------------|-------------|
| 1990 (1 month) | 3,315 | 0 | 3,315 |
| 1991 | 41,014 | 1,283 | 39,731 |
| 1992 | 42,248 | 16,540 | 25,708 |
| 1993 | 43,482 | 37,003 | 6,479 |
| 1994 | 43,482 | 40,272 | 3,210 |
| 1995 | 46,490 | 11,160 | 35,330 |
| 1996 | 47,876 | 33,598 | 14,278 |
| 1997 (4 months) | 16,368 | 12,216 | 4,152 |

Two other issues remain to be determined before the present value of plaintiff's lost income and benefits can be calculated. First, defendant alleges that Mr. Davis' effort to start the new gymnastics business from mid–1991 through mid–1992 was not a reasonable effort to mitigate his damages. Second, defendant argues that Davis' receipt of approximately $27,000 in unemployment insurance benefits should be deducted from any back pay award.

■ The plaintiff's testimony about his efforts to work in a gymnastics equipment business after his termination are somewhat sketchy. While searching for jobs in the insurance and financial services industries in 1991–92, he also attempted to help a friend in the gymnastics business in mid-May 1991 until early 1992, working a few hours each week to develop the business. (Tr. 198.) This was not an attempt, as defendant has characterized it, to start a new business, but rather it was an attempt to develop an aspect of a friend's business, without compensation unless sales of a particular piece of equipment "ever took off." (Id.) Sales didn't materialize, and Mr. Davis stopped these efforts. (Id.)

His efforts to mitigate his damages by finding suitable employment were sufficient and reasonable. His attempt at earning income in the gymnastics equipment line of work a few hours each week did not interfere with his efforts to find a job suited for his education, skills and experience. During his unemployment from December of 1990 through June of 1992, Davis testified he sent resumes to more than one hundred employers. (Tr. 191.) He reported weekly to the unemployment office and was ready to accept any job, and he kept a notebook of his efforts to find work. (Tr. 192–198; Ex. D–11.) His notebook reflects efforts from February 12, 1991 until June 27, 1992, and he applied for positions in teaching, retailing, insurance, financial services, physician's offices, and other places of employment. The notebook reflects he went for interviews on perhaps a dozen occasions. Landing his eventual job with Hertz Claims Unit took months, including an interview on November 30, 1991, follow-up correspondence on April 6, 1992, and a final interview on June 26, 1992 (Ex. D–11), before starting his job in July, 1992. The notebook confirms his recollection of having applied for more than one hundred jobs. His efforts to mitigate were sufficient and ultimately productive of a long-term job.

Mr. Davis received unemployment benefits of $10,462 in 1992, of $7,533 in 1992, and of $9,204 in 1995, according to his income tax returns. (P. Exs. O, P & Q.) As explained below, unemployment insurance benefits will not be subtracted from the back pay award under Title VII.

### CONCLUSIONS OF LAW

This court has jurisdiction over the subject matter of this claim for employment termination based on race, pursuant to 28 U.S.C. § 1331 & 1343. Under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., it is unlawful to discriminate in employment on the basis of race. Since the termination occurred before enactment of the 1991 amendments to the Civil Rights Act, it is governed by the pre–1991 version of Title VII. Landgraf v. USI Film Prods., 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).

Pursuant to 42 U.S.C. § 2000e–2(a)(1), it is an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to dis-

criminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin."

A plaintiff claiming discrimination in employment on the basis of race makes out a prima facie case of race discrimination by showing that he is within the protected class, that he was qualified to perform the job from which he was terminated, and that he was terminated "under circumstances that give rise to an inference of unlawful discrimination." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981), *quoted in Waldron v. S.L. Industries, Inc.*, 56 F.3d 491, 494 (3d Cir.1995).

■ Plaintiff has established each of the above elements of a prima facie case of discrimination. He is African–American; he was qualified to perform the Bodily Injury claims examiner job from which he was fired [7]; and he was terminated under circumstances that give rise to an inference of racial discrimination. These circumstances include, as discussed at length above, the manner in which Hollander made the decision without consultation or reflection, the irrationality and pretext of the reasons given, and the fact that Davis' performance as a claims examiner had been superior.

■ It is not necessarily required that a plaintiff in a Title VII termination case prove that he was replaced by a person of another race, *Davenport v. Riverview Gardens School Dist.*, 30 F.3d 940 (8th Cir.1994); *Williams v. Ford Motor Co.*, 14 F.3d 1305, 1308 (8th Cir.1994), because "the nature of the required showing to establish a *prima facie* case of disparate treatment by indirect evidence depends on the circumstances of the case." *Torre v. Casio, Inc.*, 42 F.3d 825, 830–31 (3d Cir.1994) (internal quotation omitted), *quoted* in *Waldron*, 56 F.3d at 494 n. 3. If such proof is required, the record reflects that plaintiff was indeed replaced by a Caucasian, Ed Robertson, who was hired on February 1, 1991. (Tr. 87; D. Ex. 1.) Although

plaintiff was no longer the PIP Supervisor when he was fired, that position was also filled by a Caucasian, Leslie Braytenbah, when plaintiff resumed his work was a claims examiner in November, 1990.

■ Where plaintiff has proved a prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's termination. *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093–94; *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, (3d Cir.1996) (en banc). Rutgers has articulated as the reason for termination that "his performance [as PIP Supervisor] markedly deteriorated to the point where his work and attitude became completely intolerable and unacceptable." (P.Ex. H. at 3.) The same general reason—deterioration of performance—was repeated three times by defendant's lawyers during the course of the administrative investigation of plaintiff's claim before the New Jersey Division of Civil Rights. (P.Ex. H at 3, 6; P.Ex. I at 1; P.Ex. J at 6.) In each instance, Rutgers' lawyers claimed that Davis' supervisor, Linda Spruill, who is also black, recommended that Davis be removed from his position because she allegedly found his performance to be unsatisfactory. (*Id.*) This rationale for termination, if true, would represent a legitimate, non-discriminatory reason for termination.

It is thus the plaintiff's burden to prove, by a preponderance of the evidence, that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093–94. If the factfinder disbelieves the proffered reasons, the factfinder is permitted, but not required, to draw an inference leading it to conclude that there was intentional discrimination, *Sheridan*, 100 F.3d at 1066–67, interpreting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Plaintiff need not prove that discrimination was the sole cause of his termination, but only that it was a motivating factor in the employer's

---

7. Defendant does not dispute that plaintiff is well-qualified for the bodily injury claims examiner position from which he was fired. Ironical-

ly, defendant has never given any reason why plaintiff was not qualified to continue to work as a claims examiner.

decision. *Miller v. CIGNA Corp.,* 47 F.3d 586 (3d Cir.1995) (en banc). The plaintiff must do more under Title VII than merely establish that the employer's decision was wrong or mistaken. *Fuentes v. Perskie,* 32 F.3d 759, 765 (3d Cir.1994).

■ Careful consideration has been given to defendant's assertion that its decision to terminate Davis was based on neutral standards informing its "business judgment." Under Title VII, a firm's business judgment of highly subjective criteria, exercised in good faith, will not be second-guessed in the absence of some evidence of impermissible motives. *Ezold v. Wolf, Block, Schorr and Solis–Cohen,* 983 F.2d 509, 527 (3d Cir.1992), *cert. denied,* 510 U.S. 826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993); *Billet v. CIGNA Corp.,* 940 F.2d 812, 825 (3d Cir.1991), citing *Lucas v. Dover Corp.,* 857 F.2d 1397, 1403–04 (10th Cir.1988). The trial court is to exercise caution and restraint against "unwarranted invasion or intrusion" into matters involving professional judgments about employee performance, *Ezold,* 983 F.2d at 527. Title VII, of course, does not protect an employee, including an African American employee, from an employer's decisions about hiring and firing that are merely erroneous or that fall within the exercise of business judgment free of illegal bias. When, however, a decision is made to terminate a member of a protected class that is illogical and incorrect, the factfinder must determine whether that decision is evidence of bias under all the circumstances of the case, under the shifting burdens of the pretext analysis, above. On the other hand, if an employer has honestly-held high expectations of its workers, the employer's criteria for job performance will be the measuring stick so long as the high standard is applied in a non-biased manner. *Thornley v. Penton Publishing, Inc.,* 104 F.3d 26, 29 (2d Cir.1997) (ADEA case).

■ Where, however, there is some evidence to cast doubt upon the employer's motives, beyond a merely erroneous personnel decision, the court must determine whether the proffered business judgment is pretextual for illegal discrimination. *Ezold,* 983 F.2d at 527; *Sheridan,* 100 F.3d at 1066–67. As applied to this case, then, the question is not merely whether defendant's assessment of Davis' performance was erroneous, but whether defendant's stated reasons are pretextual and unworthy of belief. As stated succinctly by the late Chief Judge Gerry in a Title VII case of discrimination on the basis of religion, "The question is not whether [defendant's] decision ... was an error of business judgment, but whether [plaintiff] was discriminated against because of his religion." *Weiss v. Parker Hannifan Corp.,* 747 F.Supp. 1118, 1128 (D.N.J.1990), citing *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1014 (1st Cir.1979).

■ This court has found that the defendant's expressed reasons for terminating Davis were pretextual. When one considers the circumstances of Davis' termination, one is left with the impression that defendant's view of Davis' performance was not only erroneous, but its reasons for termination were pretextual and untrue, and that this decision was the result of racial bias. See *Bray v. Marriott Hotels,* 110 F.3d 986, 992 (3d Cir.1997), citing *Sheridan,* 100 F.3d at 1067–68. In other words, the measuring stick was not applied to Mr. Davis in an unbiased manner. Plaintiff has demonstrated that his race had a determinative effect on the outcome of the termination process. *Newman v. GHS Osteopathic, Inc.,* 60 F.3d 153 (3d Cir.1995).

As noted above, the two supervisors most familiar with Davis' performance were Spruill and Coyle, who testified to their impression that Davis' race played a role in his termination. Defendant's effort to make it appear to the Division of Civil Rights that Spruill joined in Hollander's decision was refuted by Spruill's statements to the investigator and by her trial testimony and is further evidence of pretext. That Kligler viewed Davis' attitude as unsatisfactory was more likely than not the product of his biased views toward African Americans in general and Davis in particular, as outlined above. Further, Hollander consulted with Stein on many matters, large and small, including personnel decisions, and it is not credible that Hollander would not have consulted with Stein before removing Davis; Stein's views of black persons in managerial positions is

reflected by his unprovoked expression of bias toward Linda Spruill, above, and the suspicion of racial animus is not refuted by the record of hirings and terminations of African Americans, discussed above, in which the managerial ranks were thinned from five African Americans to one—Linda Spruill—within a few years of Stein's takeover of the company.

Although defendant argues that the strongly-held suspicions of Spruill and Coyle are immaterial, this court cannot disregard the informed impressions of these two supervisors who observed Davis' performance and the process of Davis' termination. Similarly, the racial slurs uttered by Stein and Kligler are not merely stray derogatory remarks, but are instead indications that, for no reason other than racial bias, two key decisionmakers, Stein and Kligler, viewed blacks negatively. Such remarks by Stein, concerning Davis' supervisor Linda Spruill, are indirect evidence that Davis, like Spruill, was seen as a "schvartze." Although Stein's remark came several years after Davis' termination and is thus not entitled to much weight regarding defendant's decision to terminate Davis, see *Ezold v. Wolf, Block, Schorr and Solis–Cohen*, 983 F.2d at 545, and *Armbruster v. Unisys Corp.*, 32 F.3d 768 (3d Cir. 1994), neither can it be swept under the rug. Such comments are relevant even when made subsequent to a plaintiff's termination, *Lockhart v. Westinghouse Credit Corp.*, 879 F.2d 43, 54 (3d Cir.1989); *Abrams v. Lightolier*, 50 F.3d 1204, 1214 (3d Cir.1995) (evidence of remarks by supervisor are admissible even though he did not make the decision to terminate plaintiff).

Kligler's direct interaction with Davis was more intense, and much more hostile, than Stein's, and Coyle's testimony that Kligler belittled Davis by calling him "Boy" and treating him harshly while treating Caucasian managers civilly is stronger evidence of bias. Kligler was an insurance expert and his biased assessment of Davis both informed and infected Hollander's opinion of Davis, as discussed above.

■■■ Finally, the finding of probable cause to believe that race was a motivating factor in Davis' termination, as found by the Division of Civil Rights, is admissible in evidence. See *Starceski v. Westinghouse Electric Corp.*, 54 F.3d 1089, 1099 n. 12 (3d Cir.1995); *Walton v. Eaton*, 563 F.2d 66, 75 (3d Cir.1977). Since this court is aware of no reason to believe that the administrative investigation of three years' duration was untrustworthy, it will also be afforded some weight. *Abrams v. Lightolier, Inc.*, 841 F.Supp. 584, 592 (D.N.J.1994), aff'd. in relevant part, remanded in part, 50 F.3d 1204 (3d Cir.1995).

In short, plaintiff Derek Davis has met his burden of proving, by a preponderance of the credible evidence, that his race was a determinative cause of defendant's decision to terminate his employment.

■■■ The appropriate remedy in this case includes an award of back pay and an order for reinstatement. Back pay will be calculated as the wages and benefits plaintiff would have earned at Rutgers Casualty from the date of termination to the present, diminished by his actual earnings in other employment, to which must be added prejudgment interest, as provided by § 706(g) of Title VII, as amended, 42 U.S.C. § 2000e–5(g), in order "to make persons whole for injuries suffered through past discrimination.'" *Loeffler v. Frank*, 486 U.S. 549, 558, 108 S.Ct. 1965, 1971, 100 L.Ed.2d 549 (1988), quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975). Contrary to defendant's argument, unemployment compensation received by the plaintiff should not be deducted from a Title VII back pay award, *Craig v. Y & Y Snacks. Inc.*, 721 F.2d 77, 81–85 (3d Cir.1983); *Abrams v. Lightolier, Inc., supra*, 841 F.Supp. at 597, modified on other grounds, 50 F.3d 1204 (3d Cir.1995); *see also Gelof v. Papineau*, 829 F.2d 452, 454–55 (3d Cir.1987) (accord in ADEA cases).

The back pay component is computed above, in accordance with § 706(g) of Title VII. Plaintiff has satisfied his duty of reasonable mitigation, pursuant to § 706(g)(1), 42 U.S.C. § 2000e–5(g)(1), which states in relevant part: "interim earnings or amounts earnable with reasonable diligence by the person ... discriminated against shall oper-

ate to reduce the back pay otherwise available." Mr. Davis made considerable efforts, characterized by reasonable diligence, to earn a living at suitable employment in the interim, and there will be a deduction amounting only to the wages and benefits he earned, and not to other speculative amounts he could conceivably have earned by taking extraordinary measures. A Title VII plaintiff "has the statutory duty to minimize damages set out in § 706(g). This duty, rooted in an ancient principle of law, requires the claimant to use reasonable diligence in finding other suitable employment." *Ford Motor Co. v. EEOC,* 458 U.S. 219, 231, 102 S.Ct. 3057, 3065, 73 L.Ed.2d 721 (1982) (footnotes omitted). The Supreme Court explained, "Although the unemployed or underemployed claimant need not go into another line of work, accept a demotion, or take a demeaning position, he forfeits his right to backpay if he refused a job substantially equivalent to the one he was denied." *Id.* at 231–232, 102 S.Ct. at 3065–66 (footnotes omitted). One who has been terminated from employment, as Mr. Davis was, faces an even more difficult task of getting hired to a new position, since prospective employers are wary of an applicant who was fired from his prior job.

While the discharged employee has the duty to mitigate loss of back pay under Title VII, the burden of proving failure to mitigate falls upon the employer. *Robinson v. SEPTA, Red Arrow Division,* 982 F.2d 892, 897 (3d Cir.1993). As applied to this case, there has been no showing by the defendant that Mr. Davis refused equivalent employment, nor that he failed to use reasonably diligent efforts to find a suitable job at any time. Davis' job search efforts continued during the time of his attempted self-employment and his efforts were eventually successful at landing an insurance industry job.

Prejudgment interest is awarded to make the Title VII plaintiff whole, *Loeffler v. Frank, supra.* Prejudgment interest in a Title VII case is an equitable remedy meant to compensate for the plaintiff's loss of the

value of money over time, and to avoid a windfall to defendant in paying past wages in current dollars while having enjoyed the use of the capital over the years. The statute does not specify the method of prejudgment interest calculation, but many courts have used, by analogy, the method of calculating prejudgment interest on back pay awards under the National Labor Relations Act, since Congress expressly modeled Title VII's back pay provision after the NLRA. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 419, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975); *see, e.g., Frazier v. SEPTA,* 814 F.Supp. 11, 13–14 (E.D.Pa.1993); *Gallo v. John Powell Chevrolet, Inc.,* 779 F.Supp. 804, 817 (M.D.Pa.1991). The decision to award prejudgment interest under Title VII and the extent of the sum awarded are discretionary within the trial court, *Robinson v. SEPTA. Red Arrow Division,* 982 F.2d 892, 897–98 (3d Cir.1993); *Frazier v. SEPTA,* 814 F.Supp. at 13, *citing Berndt v. Kaiser Aluminum & Chemical Sales, Inc.,* 629 F.Supp. 768, 770 (E.D.Pa.1985), *aff'd,* 789 F.2d 253 (3d Cir.1986). The "NLRA method" uses the adjusted federal rate established by the IRS in accordance with 26 U.S.C. § 6621, *Frazier, id., citing Florida Steel Corp.,* 231 NLRB No. 117, 96 L.R.R.M. 1070, *enf. denied on other grounds sub nom. NLRB v. Florida Steel Corp.,* 586 F.2d 436, 451 (5th Cir.1978). Other courts, in the exercise of their discretion, have selected the federal post-judgment interest rate, referred to in 28 U.S.C. § 1961,[8] which reflects the most recent U.S. Treasury 52–week treasury bill auction rate ("T-bill rate"), beginning with the rate in effect at the time of plaintiff's unlawful discharge, *Hennessy v. Penril Datacomm Networks,* 864 F.Supp. 759, 765–766 (N.D.Ill. 1994), *aff'd. in part, remanded on other grounds,* 69 F.3d 1344, 1356 (7th Cir.1995) (affirming back pay calculation including interest at 4.55% T-bill rate compounded annually); *McIntosh v. Irving Trust Co.,* 873 F.Supp. 872, 883–84 (S.D.N.Y.1995) (using 6.17% average T-bill rate applicable from time of discharge April 29, 1987 through December 31, 1994, compounded annually);

**8.** Under 28 U.S.C. § 1961(a), interest upon federal money judgments is calculated at a rate of interest determined by the average accepted auction price for the last auction of 52–week United

States Treasury bills settled immediately prior to the date of judgment. Under 28 U.S.C. § 1961(b), the interest is compounded annually.

*O'Quinn v. New York University Medical Center*, 933 F.Supp. 341, 345–46 (S.D.N.Y. 1996) (same). The late Chief Judge Gerry also applied the postjudgment interest statute, 28 U.S.C. § 1961, but chose the rate for 52–week T-bills current at the time of the judgment, rather than during the period of back pay. *Weiss v. Parker Hannifan Corp., supra,* 747 F.Supp. at 1133–34.

In the present case, plaintiff argues for application of the § 1961 federal interest T-bill rate method (Pl. Proposed Conclusions of Law ¶ 6, *citing Iannone v. Frederic R. Harris, Inc.,* 941 F.Supp. 403, 413 (S.D.N.Y. 1996)). Defendant argues for a flat 5% rate, cited by its expert witness as "a reasonable rate of return on a risk free investment during the period." (D. Ex. 8, Report of Jonas & Welsch, by Donald Welsch, Nov. 20, 1996, at p. 4.) When averaged over the period of back pay, the three methods—NLRA, T-bill, and flat rate of return for risk-free investment—yield similar rates of 5.62%, 5.16%, and 5.00%, respectively.[9]

To calculate the interest on back pay, the court will apply the prejudgment interest rate determined by averaging the 52–week T-bill rates referenced in 28 U.S.C. § 1961, namely, 5.16%, to be compounded annually, for several reasons. First, this rate is easy to determine from the federal post-judgment interest rate charts following 28 U.S.C. § 1961. Second, the 52–week Treasury bill rate has been found by Congress and by the marketplace to be a suitable approximation of the available return for a typical risk-free investment; such a benchmark is a reasonable approximation of a risk-

free investment available throughout the period in which the employer retained the employee's wages and benefits. Third, this rate falls roughly between the rate estimated by defendant's economist (5.00%) and the rate produced under the NLRA method for computing interest on back pay by application of the IRS determination of the short-term annual applicable federal rate (AFR) employing 26 U.S.C. § 6621(b)(3), calculated according to the method of 26 U.S.C. § 1274(d), *supra.* For the years (1990 and 1997) in which only a fraction of the year is the subject of the wage loss calculation, interest is calculated only for the one month in 1990 and the four months in 1997 involved. To effectuate annual compounding, the interest for each year is computed upon the basis of the total of the cumulative backpay loss outstanding at the end of each year plus the cumulative interest outstanding at the beginning of that year.

The calculation of interest on back pay will take the "Lost Income" figure found for each year, December of 1990 through April of 1997, above, adding interest appropriately at the average annual rate of 5.16%:

| Year | Lost Income | Accumulated Lost Income and Prior Interest | Interest for Year |
|---|---|---|---|
| 1990 (1 month) | $ 3,315 | $ 3,315 | $ 14 |
| 1991 | 39,731 | 43,060 | 2,222 |
| 1992 | 25,708 | 70,990 | 3,663 |
| 1993 | 6,479 | 81,132 | 4,186 |
| 1994 | 3,210 | 88,528 | 4,568 |
| 1995 | 35,330 | 128,426 | 6,627 |
| 1996 | 14,278 | 149,330 | 7,705 |
| 1997 (4 months) | 4,152 | 161,187 | 2,772 |

Total Back Pay Including Interest = $163,959

(Source: Rev. Rul. 91–1, Table 1; Rev. Rul. 92–1, Table 1; etc.)

Under 28 U.S.C. § 1961, the 52–week T-bill rates are as follows:

| | |
|---|---|
| 1/10/91 | 6.62% |
| 1/9/92 | 4.02% |
| 1/7/93 | 3.67% |
| 1/6/94 | 3.67% |
| 1/5/95 | 7.34% |
| 1/4/96 | 5.16% |
| 1/2/97 | 5.61% |
| Average 1991–97 | 5.16% |

Under the defendant's proposed flat rate of return for a risk-free investment of 5.00%, the calculation would only slightly undercompensate the averages for the NLRA method and the 52–week T-bill method, respectively.

9. We will look at these rates for the first reported figure in January of each of the relevant years, 1991–1997, rather than their periodic fluctuations, for purposes of simplifying the calculation. Under the NLRA method, the short-term annual applicable federal rates (AFR) established by the IRS under 26 U.S.C. § 6621(b)(3), calculated according to the method of 26 U.S.C. § 1274(d), are as follows:

| | |
|---|---|
| January 1991 | 7.53% |
| January 1992 | 5.12% |
| January 1993 | 4.37% |
| January 1994 | 3.98% |
| January 1995 | 7.19% |
| January 1996 | 5.50% |
| January 1997 | 5.63% |
| Average 1991–97 | 5.62% |

Therefore, the court finds that the plaintiff is entitled to recover back pay, including prejudgment interest, in the total amount of $163,959.

■ Plaintiff Davis also seeks reinstatement to his former position as claims examiner in defendant's Bodily Injury unit, or an equivalent position. The Third Circuit has pronounced that "[r]einstatement is the preferred remedy to avoid future lost earnings." *Ellis v. Ringgold School Dist.*, 832 F.2d 27, 30 (3d Cir.1987), *citing Maxfield v. Sinclair Int'l*, 766 F.2d 788, 796 (3d Cir.1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986). Reinstatement is "an obvious form of relief to make the plaintiff whole and to relieve the plaintiff of the effects of discrimination." *Id.* A reinstatement order lies within the discretion of the district court, and it should be considered when requested by the plaintiff and when circumstances warrant its award. *Id., citing Garza v. Brownsville Indep. Sch. Dist.*, 700 F.2d 253 (5th Cir.1983); *accord, Nord v. United States*, 758 F.2d 1462 (11th Cir.1985); *Taylor v. Teletype Corp.*, 648 F.2d 1129 (8th Cir. 1981), *cert. denied*, 454 U.S. 969, 102 S.Ct. 515, 70 L.Ed.2d 386 (1981); *see also, Bennun v. Rutgers State University*, 941 F.2d 154, 157 (3d Cir.1991), *cert. denied*, 502 U.S. 1066, 112 S.Ct. 956, 117 L.Ed.2d 124 (1992) (affirming Title VII order for promotion and back pay).

■ There can be rare circumstances where the reinstatement remedy is not warranted, see *Johnson v. Orr*, 776 F.2d 75, 83–84 (3d Cir.1985) (denying reinstatement where plaintiff no longer satisfied neutral statutory requirement), and *Wallace v. Dunn Const. Co. Inc.*, 62 F.3d 374, 380 (11th Cir. 1995) (denying reinstatement where plaintiff's lies regarding narcotics convictions made her ineligible for employment).

■ The circumstances of this case clearly warrant immediate reinstatement, as plaintiff Davis remains fully ready, willing and able to resume his duties as a claims examiner. Happily, there is not an abiding animosity between plaintiff and his former employer, and each side has agreed that reinstatement would be an appropriate remedy in the event Title VII liability were found.[10] The court will order defendant to reinstate Mr. Davis to his previous position as claims examiner in defendant's Bodily Injury unit or a comparable position, at a salary of not less than the amount he otherwise would have earned in this position, determined above as $46,260, plus all benefits for an employee in that position today.[11]

Finally, plaintiff qualifies as a prevailing party pursuant to 42 U.S.C. § 2000e–5(k), which permits the court to award "a reasonable attorney's fee (including expert fees) as part of the costs."[12] The court will award such costs in this case, which shall also include the plaintiff's cost of trial transcripts which were obtained pursuant to the court's directive to facilitate factfinding and review.

## CONCLUSION

For the reasons stated herein, the court finds that the plaintiff, Derek E. Davis, has proved he was terminated from his employment by defendant Rutgers Casualty Insurance Co., on account of his race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–2(a)(1). As a

---

**10.** The defendant employer's consent to reinstatement is never required under Title VII, if the circumstances warrant reinstatement to make the plaintiff's remedy whole. *Gallo v. John Powell Chevrolet Inc., supra*, 779 F.Supp. at 815; *Evans v. Ford Motor Co.*, 768 F.Supp. 1318, 1327 (D.Minn.1991).

**11.** Salary of a reinstated Title VII plaintiff shall be at a rate of pay he would have earned but for the discriminatory termination, which has been calculated above based upon the assumptions noted regarding annual pay increases. *See EEOC v. Eazor Exp. Co.*, 499 F.Supp. 1377, 1388 (W.D.Pa.1980), *aff'd*, 659 F.2d 1066 (3d Cir.

1981) (Table); *Truskoski v. ESPN, Inc.*, 823 F.Supp. 1007, 1016 (D.Conn.1993); *Brunetti v. Wal–Mart Stores, Inc.*, 525 F.Supp. 1363, 1377 (E.D.Ark.1981).

**12.** Plaintiff's application for attorney's fees shall be filed, pursuant to Rule 54(d)(2), Fed.R.Civ.P., within fourteen days after entry of the accompanying Judgment, in the format for attorney fee applications provided in former General Rule 46 of this Court, recodified as L. Civ. R. 54.2 (D.N.J.) (effective April 1, 1997). Any opposition thereto should be submitted within fourteen days of filing.

remedy, the court will order back pay including prejudgment interest in the amount of $163,959 and immediate reinstatement to the position of claims examiner in the defendant's Bodily Injury unit, or a substantially equivalent position, at a salary of not less than $46,260 plus all applicable benefits, pursuant to 42 U.S.C. § 2000e–5(g), together with an award of plaintiff's reasonable attorney's fees and costs, pursuant to 42 U.S.C. § 2000e–5(k).

The accompanying Judgment shall be entered.